**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**WINCHESTER DIVISION**

| | | |
|---|---|---|
| **ADAM BRASEEL,** | ) | |
| | ) | |
| *Petitioner,* | ) | |
| | ) | |
| **v.** | ) | No. _____ |
| | ) | |
| **DARREN SETTLES, Warden** | ) | |
| **Bledsoe County Correctional Complex,** | ) | |
| | ) | |
| *Respondent.* | ) | |
| | ) | |

---

## PETITION FOR WRIT OF *HABEAS CORPUS*

---

Pursuant to all rights available under Article I § 9 and Article III of the United States Constitution; the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, 28 U.S.C. § 2201, and 28 U.S.C. § 2241, *et seq.*, including 28 U.S.C. § 2254, Petitioner Adam Braseel respectfully submits this petition for a writ of habeas corpus, including issues as raised in state court proceedings, declaring unconstitutional his convictions, including his conviction for first degree murder (merged with his conviction for felony murder), especially aggravated robbery, attempted first degree murder (merged with his conviction for aggravated assault), and assault.

### I.  INTRODUCTORY FACTS

1.  Adam Clyde Braseel clocked out of work, borrowed his mother's car and headed to the mountain for a weekend of four-wheeling with friends. He took about a 45-minute break in between to lure an old man from home in the dark, beat him to death by the roadside, steal his wallet and try to silence an eyewitness. He made it to his next stop in time for a late supper.

That's the argument that convinced a Grundy County, Tennessee, jury to send Mr. Braseel, then 24, to prison for life a decade ago for the death of 60-year-old Malcolm Burrows.

2. This is rare case of actual innocence. The whole theory of the trial — that Malcolm Burrows was killed in the course of a robbery — was based on knowingly perjured testimony that Mr. Burrows's wallet was missing when, in fact, the wallet was found by police on his body but was never entered into evidence. The government's entire theory of the crime — that it was a botched robbery — depended on this perjury. Further, Mr. Braseel was connected to the crime by faulty and unconstitutional eyewitness identifications which his counsel failed to suppress. Mr. Braseel's counsel also failed to present at trial either (i) the numerous alibi witnesses who would have verified Mr. Braseel's whereabouts at the time of the crime or (ii) the alternate theories regarding the many others in the community who had strong motive to commit the crimes at issue. Compounding these errors, jurors at Mr. Braseel's trial were intimidated into making findings of guilt, and one juror in particular never determined that Mr. Braseel was guilty.

3. Had the trial been conducted appropriately, jurors would not have heard the perjured testimony that Malcolm Burrows's wallet was missing at the time his body was found. When Sergeant Mike Brown discovered Malcolm Burrows' body, he observed a wallet in Burrows's back pocket. The wallet was never logged into evidence nor referenced in any police report. The District Attorney did not disclose to defense counsel that the wallet was found on the victim (information which would have wholly undermined the State's theory of the case) and neither defense counsel nor the District Attorney called Sergeant Brown to testify at trial. The jury convicted Adam Braseel based on knowingly false theory that Burrows's wallet was stolen by the person who took his life. Had the jury heard the truth — that Burrows's wallet was found

on his body and that the crime was not a botched robbery — the outcome of Adam Braseel's trial would have been different.

4.     Had Petitioner's defense counsel effectively represented him, the only evidence which connected him to the crime — the flawed eyewitness identifications — would have been excluded. The jurors would have heard, instead, from the numerous witnesses who would have provided alibi evidence for Adam Braseel. The jurors also would have heard about the other individuals who had motive to murder Burrows, who was a known drug dealer responsible for numerous crimes in the community. Had any of these things happened, the outcome of Adam Braseel's trial would have been different.

5.     This is, further, a case of juror intimidation and bias within a jury. The jurors were told by the jury foreman to rely on theories not supported by the evidence. They were told by that same foreman to find Mr. Braseel guilty despite their belief in his innocence. One juror in particular was intimidated into remaining silent about her vote of not guilty and only once she moved away from Grundy County did she feel that she was able to share the truth — that she never found Adam Braseel guilty of the charges brought against him.

6.     Adam Braseel is entirely innocent of the charges brought against him. Respectfully, Mr. Braseel requests that his convictions be overturned and the case dismissed with prejudice. In the alternative, Mr. Braseel requests a new trial.

## II.     JURISDICTION and VENUE

7.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 2241(a), and 2254(a).

8.     Venue is proper in the United States District Court for Middle District of Tennessee. 28 U.S.C. § 2241(d).

### III.   PARTIES

9.      Petitioner Adam Braseel is in the custody of the Tennessee Department of Correction ("TDOC") and presently resides in the Bledsoe County Correctional Complex ("BCCX"), 1045 Horsehead Road, Pikeville, Tennessee, 37367.

10.     Respondent Darren Settles is the BCCX Warden and an agent of the State of Tennessee. Warden Settles' address is Bledsoe County Correctional Complex ("BCCX"), 1045 Horsehead Road, Pikeville, Tennessee, 37367.

11.     Adam Braseel's inmate identification number is 00432115.

### IV.   FACTUAL HISTORY

####     *A.     Adam Braseel was in Coalmont, Tennessee with friends when the crimes on Mellisa Rock Road occurred.*

12.     In January 2006, Adam Braseel was a young man starting out in life. Trial Tr. III at 296-99.[1] Mr. Braseel was raised in Grundy County but had moved to Manchester, Tennessee following high school graduation. *Id.* at 297. In the years since moving to Manchester, Mr. Braseel had returned to Grundy County only on occasion, visiting a total of five or six times to ride four wheelers and to visit with friends. *Id.* at 298.

13.     On the morning of Friday, January 6, 2006, Mr. Braseel got off work and returned to Grundy County to visit a friend, Charles Partin, in Coalmont, Tennessee. Trial Tr. III at 300-01. Mr. Braseel spent a day and a half visiting with Partin, leaving around 9:15 or 9:30 in the evening on Saturday, January 7, 2006. *Id.* at 301; Trial Tr. II at 234; P.C. Tr. at 30. Danny Johnson and Robin Smith were with Mr. Braseel at Partin's home and confirmed that Mr. Braseel left the house between 9:00 and 9:15 p.m. P.C. Tr. at 36, 40.

---

[1]      For reference, "Trial Tr." refers to the transcript of the original trial of Mr. Braseel. It consists of multiple volumes, which are referenced before the specific page number of each.

14.     Mr. Braseel met up with friend Jake Baum and Baum's girlfriend, Kristen King, in the Coalmont church parking lot to talk and visit. Trial Tr. III at 302-03; Trial Tr. II at 278; P.C. Tr. at 43. After talking with the two for around five to fifteen minutes, Mr. Braseel drove to the home of friend, Josh Seagroves, arriving at 10:00 p.m. Trial Tr. III at 302-03; Trial Tr. II at 287-90.

15.     When Mr. Braseel greeted Seagroves, he was his normal self — he was not upset and did not appear as if anything out of the ordinary had occurred prior to his arrival. Trial Tr. III at 304. Mr. Braseel then went four-wheeling with Seagroves and other friends and spent the night at Seagroves' home. Trial Tr. III at 302-03; Trial Tr. II at 287-90. James Brown and Darren Nunley confirmed that Mr. Braseel arrived at Seagroves house between 9:00 and 10:00 p.m. on the night of January 7. P.C. Tr. at 65, 72.[2] Mr. Braseel did not travel to Mellisa Rock Road or any other location in Tracy City that night. Trial Tr. III at 311.

**B.      The crimes which occurred on Mellisa Rock Road.**

16.     While Mr. Braseel was visiting with friends in Coalmont, a dark scene was unfolding on Mellisa Rock Road — a fifteen to twenty minute drive away. *See* Trial Tr. II at 182. According to Rebecca Hill, she was at home with her brother, Malcolm Burrows, and her son, Randy Kirk Braden, when a man came to the door and asked for help with car trouble. Trial Tr. I at 36. Hill agreed — only after it was suggested by the prosecutor — that the man arrived at 9:00 or 9:15 on the night of January 7. *Id.*

17.     Burrows, according to Hill, spoke with the man for about three or four minutes, agreed to help him, and left with the man in Hill's vehicle. *Id.* at 36, 48. Hill reported that the man returned to the house alone about twenty minutes later and informed her that Burrows had

---

[2]     For reference, "P.C. Tr." refers to the transcript of the evidentiary hearing the State court held on the post-conviction petition for relief filed by Mr. Braseel.

sent him back for starter fluid. *Id.* at 37. When Hill reached under the sink to look for the starter fluid, the man began to hit her about the head and back with "a tire tool or something." *Id.* at 41. The man was not wearing gloves, according to Hill. *Id.* at 53.

18.     Kirk Braden, the adult son of Hill, testified that he was asleep when he heard his mother screaming. *Id.* at 70-72. In Braden's account, he rushed from the bedroom to find his mother being attacked. *Id.* at 72. The man, Braden said, was holding a "sharp object" standing over Hill. *Id.* Braden reported that he pulled the man off of Hill and that the man threw a fire extinguisher from under the sink at Braden, hitting him in the right shoulder; the man then ran out of the side door of the house. *Id.* at 73-74. Braden reported that he provided some ice to his mother, and then ran outside to observe the man leave in a car with a sunroof and front-end damage. *Id.* Braden identified the man as having red hair and wearing a ball cap. *Id.* at 78.

19.     Braden ran to the home of Tommy Flurry where he called 9-1-1 at 9:52 p.m. *Id.* at 82. He then returned to the house and Hill let him back inside. *Id.* at 84. Braden testified that he picked up a small baseball bat, which was broken in two, and placed it in a trash can. *Id.* When asked why he had moved the bat, Braden testified: "I couldn't really tell you." *Id.* at 85.

20.     Jeffrey White, a neighbor, stopped by the Burrows house that night to ask Kirk Braden about what had taken place; he was fearful that a violent man was on foot in the neighborhood. Trial Tr. I at 109. According to White, Braden told him that the man ran up the road after the assault rather than leaving in a car; White remembered this account because it confirmed his fear that a dangerous individual was loose in the neighborhood. *Id.*

21.     Sergeant Michael ("Mike") Brown, a night patrol sergeant for the Grundy County Sheriff's Department, responded to the call for emergency assistance. *Id.* at 91; *see* Ex. 1, Decl. of Michael Brown ¶ 3. When he arrived at the house, he spoke with Hill and Braden who

reported that they had been assaulted prior to his arrival. Brown Decl. ¶ 4.

22.     After the ambulance arrived, Sergeant Brown left the home and stopped by the vehicle that Burrows had reportedly taken. Brown Decl. ¶ 4. Sergeant Brown walked up a trail next to the car and discovered the body of Malcolm Burrows. Brown Decl. ¶ 4.

23.     When Sergeant Brown discovered the body, Burrows was fully clothed. Brown Decl. ¶ 6. His hooded sweatshirt was pulled up above the waistline of his pants, and Sergeant Brown observed that Mr. Burrows' wallet was in his back pocket at that time. Brown Decl. ¶ 6. Sergeant Brown did not remove the wallet or otherwise move the body. Brown Decl. ¶ 6.

24.     Sergeant Brown then called his partner Billy Scissom to return to the scene. Brown Decl. ¶ 7. When he arrived, Sergeant Brown showed him the scene. Brown Decl. ¶ 8. Sergeant Brown then reported the corpse and possible homicide to Dispatch. Brown Decl. ¶ 8.

25.     Sheriff Brent Myers and Tennessee Bureau of Investigation Agent Larry Davis arrived at the scene sometime later, and Sergeant Brown left the two at the scene. Brown Decl. ¶ 9.

26.     Agent Davis confirmed in his testimony that Sergeant Brown and his partner Lieutenant Scissom were at the scene when he arrived. *Id.* at 171. Although Agent Davis confirmed Sheriff Myers' presence at the scene during his preliminary hearing testimony, he omitted this fact from his testimony at trial. Prelim. Hr'g at 35; Trial Tr. II at 171. Agent Davis testified that there was no wallet on Malcolm Burrows' body. Trial Tr. II at 153. Sheriff Myers testified that he was in Chattanooga when he was informed of the murder and did not visit the scene. Trial Tr. III at 263-64. That testimony was false.

27.     On January 8, 2006, Chief Deputy Lonnie Cleek informed Agent Davis that

Adam Braseel had been developed as a suspect in the crime. Trial Tr. II at 180. There was no evidence produced at trial regarding how Adam Braseel came to be a suspect in the crimes at issue, that he had any real prior relationship with the victims, or that he would have had any motive to kill Malcolm Burrows. Hill testified that Burrows was carrying roughly $800 in cash at the time of his death, but there was no evidence presented that anyone other than Hill knew about that cash. Further, the wallet was not, in fact, stolen by whoever killed Burrows.

28.  Only two characteristics tied Mr. Braseel to the crime: (1) he had red hair; and (2) he was driving a gold vehicle. Angela White, a neighbor to Malcolm Burrows, testified that on January 6,[3] she observed an unfamiliar vehicle parked in front of her house facing Burrows' home. Trial Tr. at 100-01. She described the vehicle as a "gold, shiny, new model car." *Id.* at 101. She said that a photograph of Mr. Braseel's car "looked like the car." *Id.* at 102. She could not provide any information about the driver or whether there were passengers in the car. *Id.*

29.  Jay Douglas provided a statement to police that he arrived at Malcolm Burrows' residence on January 6, 2006, to find Burrows speaking with a white male, six feet tall, with dark hair over his ears. The man had a blonde woman with him, and the two were driving a tan or gold car. When Sheriff Myers wrote up his notes from Douglas' interview, he changed the description of the individuals in the car. Instead of writing what Douglas communicated — that the occupants of the car were a man with dark hair and a woman with blonde hair — Sheriff Myers wrote: "[Douglas] told me that the subject in the car was a white male between twenty five and thirty years old *with red hair*." This was a false account of Jay Douglas' interview.

30.  Other suspects were not developed in the case. On March 2, 2007, Phillip Clay provided a statement to Chief Deputy Cleek that he had information, provided to him by Dana

---

[3]     Ms. White testified at the post-conviction hearing that she saw the car on January 7, not January 6. P.C. Tr. at 61.

Frederick, that her father Eck Frederick killed Malcolm Burrows. P.C. Tr. at 53.

### C.    *The identifications by Rebecca Hill and Kirk Braden were impermissibly suggestive and, therefore, should have been excluded.*

31.    Braden testified that he was first shown a photograph for identification four or five days after the incident. Trial Tr. II at 93. He testified that the Sheriff had a stack of photographs on his desk and that he identified the man in the first photograph on the top of the stack — Mr. Braseel — as the man who had perpetrated the crime. *Id.* at 94. Sheriff Myers testified that Braden came into his office while the case file was opened and spread across the desk, that Braden observed the reports and photographs on the desk, and that Braden pointed to the picture of Mr. Braseel as the man who committed the crime. *Id.* at 268. Only then did Sheriff Myers pick up the other photos and hand them to Mr. Braden. *Id.* at 269.

32.    The testimony was inconsistent and conflicting regarding the method and manner of Hill's identification of Mr. Braseel as the man who attacked her on January 7, 2006. Hill testified that she saw the man only briefly before she sustained massive head trauma. Trial Tr. I at 48. She testified that her memory was unreliable due to the head trauma and that it was all "like a dream." *Id.* at 44. She did not recall being taken in the ambulance or being airlifted to a nearby hospital where she remained unconscious for nearly five days. *Id.* at 44.

33.    At the preliminary hearing on February 28, 2006, Hill testified that the identification took place at her sister's home and that it was at her sister's house that she picked out the photograph of Mr. Braseel. Prelim. Hr'g Tr. at 10-11, 20-21, 30.[4] Hill also testified that Sheriff Myers showed her photographs of Mr. Braseel's vehicle while she was at her sisters. *Id.* at 32-33.

---

[4]    For reference, "Prelim. Hr'g Tr" refers to the transcript of the preliminary hearing held by the State court before the trial after Mr. Braseel's arrest.

34.     At trial, Hill testified that the officers came and talked to her when she arrived home from the hospital, but that she did not know whether they showed her photographs at that time. Trial Tr. I at 46. She testified that she later went to the jail and looked at some pictures. *Id.* Hill testified that she could not provide a timeline between when the officers came to her home and when she went to the jail because she was "heavily medicated" *Id.* at 56.

35.     Chief Deputy Lonnie Cleek testified at trial that he did not show Hill the photographs at her home because she was not in a condition to make the identification. Trial Tr. II at 253. Further, Cleek testified that Hill identified her attacker as the man in the second row, third photograph from the right. Trial Tr. II at 255; Trial Exh. 25. The photograph that Hill identified, according to Cleek, was not Mr. Braseel. *See* Trial Exh. 25.

36.     Defense counsel at trial, Floyd Davis and Robert Peters, did not move to suppress the eye witness identifications of Rebecca Hill or Kirk Braden. These identifications were the only evidence which tied Mr. Braseel to the crimes at issue.

37.     Defense counsel did not cross-examine Lonnie Cleek or Rebecca Hill on the fact that Hill identified a different man in the photo lineup as the man who attacked her. Defense counsel also failed to argue this point in his closing argument.

### D.     The Trial was marked by errors, false testimony, and juror intimidation.

38.     Adam Braseel was tried on November 7-9, 2007.  At the trial, the following individuals testified: Rebecca Hill, Kirk Braden, Angela White, Jeffrey White, Chris McBee, Troy Brown, Andrew Martin West, Agent Larry Davis, Dr. Feng Li, Agent Elizabeth Reed, Agent Margaret Bash, Charles Partin, Jr., Lonnie Cleek, Sheriff Brent Myers, Kristen King, Joshua Seagroves, and Adam Clyde Braseel.

39.     Prior to trial, Sergeant Mike Brown discovered that the Braseel case was

proceeding to trial. Brown Decl.¶ 10. He contacted the District Attorney's office about testifying at the trial, but they responded that they did not need him to testify because they had it covered. Brown Decl.¶ 10.

40.     At the preliminary hearing, Agent Davis confirmed that he met Sergeant Brown, Sheriff Myers, and Lieutenant Billy Scissom at the crime scene. Prelim. Hr'g Tr. at 35. By trial, however, the testimony had changed; Agent Davis omitted reference to Sheriff Myers's presence at the crime scene. Trial Tr. II at 171. Sheriff Myers, however, specifically testified that he was in Chattanooga with his son who was in the hospital when the murder occurred and that he met Becky Hill at the emergency room when she arrived by helicopter. Trial Tr. III at 263-64. This was false.

41.     If Sergeant Brown had been called at trial, he would have testified that he observed a wallet in Mr. Burrows's back pocket and that Agent Davis and Sheriff Myers met him at the crime scene. Conversely, the testimony the State presented at trial regarding the absence of the wallet and the location of Sheriff Myers at the time of the murder was false.

42.     Defense counsel failed to call numerous alibi witnesses such as Jake Baum, Robin Smith, Danny Johnson, and Phillip Clay.

43.     Defense counsel failed to call witnesses regarding others who may have committed the crime, such as those who were familiar with claims that Eck Fredericks had killed Mr. Burrows. Defense counsel never explored why the Sheriff claimed that Jay Douglas said there was a man with red hair in the gold vehicle, when in fact Mr. Douglas stated clearly that the occupants of the gold car were a man with dark hair and a blonde women.

44.     According to Agent Davis, he did not find anything at the scene that would link anyone to the killing of Malcolm Burrows. *Id.* at 153. The TBI lab, likewise, found nothing in

their examination of Mr. Braseel's vehicle that would link him to the crimes. *Id.* at 169. In fact, Agent Davis testified that there was no physical evidence collected — at the two violent crime scenes, on Mr. Braseel's person, in his vehicle, or from any other source — which would connect Mr. Braseel to the crimes at issue. *Id.* at 179-80.

45.     According to Agent Elizabeth Reed, who conducted the latent fingerprint analysis, there were no latent fingerprints which matched Mr. Braseel. Trial Tr. II at 216-17. There were identifiable latent fingerprints recovered, however, for which no match was found. *Id.* at 216. Likewise, Agent Margaret Bash, of the TBI crime lab, testified that she found no blood on Mr. Braseel's baseball cap, his jacket, or gloves; she also found no blood on a tire tool or a stick from Mr. Braseel's vehicle. *Id* at 220-21, 224. She also testified that there was no indication that these items had been cleaned. *Id.* at 227-28.

46.     Even the time and date of Malcolm Burrows's death was not established at trial. According to the testimony of medical examiner Dr. Feng Li, Malcolm Burrows died of multiple blunt force trauma. Trial Tr. II at 201. In response to questioning about whether Mr. Burrows could have been in the woods for a week or two, Dr. Li testified that "it is very hard to say . . . how long or how far away this patient died." *Id.* at 203. The only evidence that established the timeline of Malcolm Burrows' death was the testimony of Becky Hill and Kirk Braden.

47.     Neither the defense nor the prosecution called Jay Douglas to testify at trial regarding his identification of a man and woman driving a gold car on January 6, 2006. This testimony would have rebutted the implication from Ms. White's testimony that it was Mr. Braseel who was at the Burrows residence on January 6. Further, defense counsel failed to cross-examine Sheriff Myers regarding why his report changed the detail regarding the occupants of the gold vehicle.

48.     At Mr. Braseel's trial, at least one juror ("Juror 1") believed that Mr. Braseel was innocent of the charges brought against him, but was intimidated into silence by a biased jury foreman. Juror 1 reported that the jury foreman made many comments during deliberations that were not right and led her to believe that he was not impartial. Decl. of Juror 1 ¶ 3.[5] Juror 1 was intimidated by the foreman's demeanor. Juror 1 Decl. ¶ 3.

49.     During deliberations, the jury foreman said that if Mr. Braseel did not commit the crimes then he was at least involved in them. Juror 1 Decl. ¶ 3. There was no evidence presented at trial that Mr. Braseel was an accomplice in any of the crimes.

50.     The foreman also stated to Juror 1 and other jurors in deliberation, "Don't worry. If Adam is innocent, he can fix it on appeal." Juror 1 Decl. ¶ 5. After the foreman made that statement, several jurors changed their votes to guilty. Juror 1 Decl. ¶ 5.

51.     Juror 1 also reports that items were included in the box of evidence given to the jury that were not presented during the trial. Juror 1 Decl. ¶ 6.

52.     Juror 1 has sworn that she never agreed in deliberations that Mr. Braseel was guilty, and that she never wrote down or signed anything that said that Mr. Braseel was guilty. Juror 1 Decl. ¶ 7. When the jury went out together into the courtroom as the verdict was read, Juror 1 was distraught and in tears. Juror 1 Decl. ¶ 7. Defense counsel did not orally poll each juror individually, and Juror 1 does not recall ever raising her hand to indicate that she agreed with the verdict. Juror 1 Decl. ¶ 8.

53.     Juror 1 did not speak up about the faulty verdict before because she was afraid for

---

[5]     For reference, "Juror 1 Decl." refers to the Declaration filed under seal as Exhibit 2 to this petition. The juror's name is listed in the sealed version; a redacted version contains the Declaration without the juror's name. Mr. Braseel respectfully moves to permit the filing of the sealed exhibit due to the privacy interests of the juror and the juror's legitimate fear of retaliation.

her safety due to the crime and corruption in Grundy County. Juror 1 Decl. ¶ 9. She only feels safe to come forward now that she has moved to a different county. Juror 1 Decl. ¶ 9.

54. The corruption in Grundy County under Sheriff Myers has shaped the prosecution and post-conviction proceedings in Mr. Braseel's case. The current sheriff, Clint Shrum, stated: "When I took office on September 1, 2014 there was not even a single case file on the Braseel Case at the Sheriff's Office. The question is this; was there something the past administration did not want me to see?" *See* Ex. 3, Email from Sheriff Clint Shrum.

## V. PROCEDURAL HISTORY

55. Adam Braseel was convicted of first-degree murder, first-degree felony murder, especially aggravated robbery, attempted first degree murder, and aggravated assault in Grundy County, Case No. 4221. The Circuit Court for Grundy County, located in Altamont, Tennessee, sentenced Mr. Braseel to life imprisonment with the possibility of parole for his convictions for first degree murder, which was merged with his conviction for felony murder. Mr. Braseel was sentenced to fifteen (15) years imprisonment for his conviction for especially aggravated robbery of Malcolm Burroughs. Additionally, Mr. Braseel was sentenced to fifteen years imprisonment for the attempted murder of Rebecca Hill, and three (3) years for his conviction for the aggravated assault of Rebecca Hill. Finally, Mr. Braseel was sentenced to eleven (11) months and twenty-nine (29) days for his conviction for the assault of Kirk Braden. These sentences were ordered to run concurrently with each other.

56. On direct appeal, the Tennessee Court of Criminal Appeals affirmed Mr. Braseel's convictions for first degree murder, especially aggravated robbery, and assault, but remanded the case so that the judgment of conviction appropriate reflected the merger of Count I (first degree murder) and Count II (first degree felony murder); the Court also remanded to

merge Count IV (attempted murder of Rebecca Hill) and Count V (aggravated assault of Rebecca Hill). *See State v. Braseel*, No. M2009-00839-CCA-R3-CD, 2010 WL 3609247 (Tenn. Crim. App. Sept. 17, 2010), *perm. to appeal denied*, Feb. 17, 2011.

57.     Mr. Braseel's appointed counsel raised the following issues on direct appeal to the Tennessee Court of Criminal Appeals:

  a.  Whether the in-court identification of the Defendant by the witnesses Becky Hill and Kirk Braden was unreasonably affected by elements of suggestiveness in a photographic lineup to the extent that the Defendant was denied due process of law and a fair trial.

  b.  Whether the evidence in this case was sufficient to support the jury's finding of fact of guilt beyond a reasonable doubt.

  c.  Whether the evidence in this case was sufficient to support the jury's finding of guilt of first-degree murder, felony murder, and especially aggravated robbery of Malcolm Burrows.

58.     Mr. Braseel's Application for Permission to Appeal to the Tennessee Supreme Court was denied.  *State v. Braseel*, No. M2009-0839-SC-R11-CD (Feb. 17, 2011) (per curium).

59.     Mr. Braseel's Petition for Relief from Conviction and Sentence was filed on February 14, 2012. On review, the trial court granted Mr. Braseel relief and ordered a new jury trial. The post-conviction trial court concluded that Mr. Braseel did not receive effective assistance of counsel at the jury trial due to trial counsel's failure to move to suppress the identification of Mr. Braseel by Rebecca Hill and Kirk Braden. Mr. Braseel's counsel raised the following issues in State Post-Conviction:

  a.  Mr. Braseel's attorneys failed to move to suppress the single photo lineup, presented to Kirk Braden, alleged eye witness and victim who testified at trial.

b. Mr. Braseel's attorneys failed to notice the misidentification of the Petitioner at trial by Rebecca Hill, alleged eye witness and victim who testified at trial but is now deceased.

c. Mr. Braseel's attorneys failed to argue to the trial jury that Rebecca Hill, soon after the crimes, could not identify the Petitioner in a photo lineup.

d. Mr. Braseel's attorneys failed to request, and the trial court failed to charge, the trial jury of T.P.I. 42.05 Identity.

e. The trial proceeding was flawed.

f. There is absolutely no evidence relating Mr. Braseel to the crimes, except for the identification, of Rebecca Hill and Kirk Braden, of which was flawed as aforementioned.

g. Trial counsels' failure to object to the single photo lineup and the failure to move to suppress said lineup, constituted a waiver thereof, thus not allowing the appellate court to consider said issues.

h. The conviction was based on the unconstitutional failure of the prosecution to disclose to defendant evidence favorable to the defendant;

i. The conviction was based on action of a grand jury or petit jury that was unconstitutionally selected and impaneled;

j. Denial of effective assistance of counsel;

k. The defense failed, throughout the course of Mr. Braseel's trial, to object to the State leading witnesses, often with inadmissible hearsay evidence, thereby failing to offer Mr. Braseel effective assistance of counsel; and

l. Illegal evidence.

60.    The State appealed from the post-conviction trial court's judgment. The Court of Criminal Appeals found that the evidence preponderated against the factual findings of the post-conviction court and reversed its judgment. *Braseel v. State*, No. M2016-00057-CCA-R3-PC (Tenn. Crim. App. Oct. 7, 2016). Mr. Braseel's application for permission to appeal was denied by the Tennessee Supreme Court on February 24, 2017.

61.    Mr. Braseel has filed a Motion for Status Conference with the Circuit Court for

Grundy County seeking to ascertain the status of the claims raised in the post-conviction petition which were pretermitted by the Court's determination that Adam Braseel was entitled to a new trial based on the trial counsel's failure to move to suppress the unconstitutional eye witness identifications. The Court of Criminal Appeals reversed the post-conviction court's determination with respect to the decided issue but remained silent with respect to those issues not reached by the post-conviction court.

62.     Mr. Braseel has also filed a Petition for a Writ of Error Coram Nobis arising out of the new evidence provided by Sergeant Mike Brown and Juror 1.

63.     To the extent that Mr. Braseel attempts to ensure that he has exhausted all state court remedies, Mr. Braseel has contemporaneously filed with this Petition a motion seeking to stay the federal proceedings until the state court proceedings have concluded.

64.     The claims in this Petition include those referenced in the state court opinions on direct appeal and in the post-conviction proceedings cited above. Mr. Braseel respectfully incorporates the entire state court record in support of such claims.

VI.     **CONSTITUTIONAL CLAIMS FOR RELIEF**

A.     *Ineffective Assistance of Counsel at Trial in Failing to Investigate and Present Evidence.*

65.     In violation of the Sixth and Fourteenth Amendments, trial counsel were ineffective at the guilt phase of trial by failing to investigate and present evidence to establish a defense to the charges, evidence which also would have been relevant to sentencing. Counsel performed deficiently, and, as a result, Adam Braseel was prejudiced:

a.     Trial counsel failed to present a complete defense to the charges against Adam Braseel, including by investigating and presenting evidence establishing either that someone else committed the offense or that there was a reasonable doubt about Adam Braseel's guilt.

Governing standards of performance, including those of the American Bar Association adopted by Tennessee, required counsel to investigate all avenues of defense on Adam Braseel's behalf. Evidence not investigated by counsel includes:

i. Evidence showing that Eck Frederick committed the murder and assaults, including but not limited to:

   a) Evidence that Dana Frederick gave a statement that her father Eck Frederick killed Malcolm Burrows;

   b) Evidence that Christa Garner owed a large amount of money to Malcolm Burrows;

   c) Evidence that Christa Garner refused to repay the money to Mr. Burrows and so he killed her horses; and

   d) Evidence that Christa Garner hired someone to assault Malcolm Burrows.

ii. Evidence showing that someone was hired by Christa Garner to assault and ultimately kill Malcolm Burrows and Hill and Braden as witnesses, including but not limited to:

   a) Evidence that Christa Garner owed a large amount of money to Malcolm Burrows;

   b) Evidence that Christa Garner refused to repay the money to Mr. Burrows and so he killed her horses; and

   c) Evidence that Christa Garner hired someone to assault Malcolm Burrows.

iii. Evidence showing that Kirk Braden killed Malcolm Burrows and

assaulted his mother, Becky Hill, including but not limited to:

    a) Evidence that Kirk Braden had assaulted his mother on other occasions;

    b) Evidence that no witness tied a third-party perpetrator to the crimes other than the testimony of Kirk Braden and Becky Hill;

    c) Evidence that Malcolm Burrows' time of death could not be established forensically or by other eye witnesses;

    d) Evidence that Kirk Braden could have staged the scene to support a fabricated narrative regarding the murder of Malcolm Burrows and the assault of his mother;

    e) Evidence that Kirk Braden admitted to moving one of the weapons following the crimes; and

    f) Kirk Braden could have intimidated or conspired with his mother to identify Adam Braseel as the perpetrator of the crimes.

iv. Evidence showing that a gold car driven by a man with dark hair and a woman with blonde hair was at Malcolm Burrows' residence on the day before the crimes, including but not limited to:

    a) The statement of Jay Douglas that he observed a gold car driven by a man with dark hair and a woman with blonde hair on January 6, 2006; and

    b) The statement of Angela White that she observed a new model gold car, and not a twelve-year-old model as belonged to Adam Braseel's mother.

v.    Evidence that the murder and assaults were drug-related and/or motivated by in-fighting related to the drug trade, including:

     a) Malcolm Burrows was involved in the trafficking of drugs in Grundy County, and was involved with person(s) involved in drug dealing;

     b) Those involved in the drug trade in Grundy County would have had motive to kill over money owed related to the drug trade.

vi.    Evidence that Malcolm Burrows was not killed in the course of a robbery, indicating that the crimes were not motivated by robbery as argued at trial and that person(s) subsequently covered up the true motive of the crimes, including:

     a) New evidence from Sergeant Michael Brown demonstrating that Malcolm Burrows' wallet was in his back pocket at the time his body was found;

     b) The wallet was never catalogued into evidence and its existence was not disclosed to defense counsel — its nondisclosure also violates due process under *Brady*, at both the guilt and sentencing phases of trial; and

     c) The absence of the wallet and the false testimony of Sheriff Myers that he was not ever at the crime scene indicates that killing and assaults were not motivated by robbery but were, instead, covered up after the fact by Grundy County officials.

b. Trial counsel failed to establish a defense to the charges or to bolster the alibi

defense actually presented by the defense to show that Adam Braseel's alibi defense was valid, and that there was reasonable doubt about guilt because Adam Braseel was in Coalmont, Tennessee at the time that the crimes occurred in Tracy City, Tennessee. Among the evidence which counsel failed to investigate in order to prove that Adam Braseel's alibi was valid, includes:

     i.     Evidence that Adam Braseel was with Charles Partin at his home until 9:15 p.m. on January 7, 2006, including:

          a)  Evidence that Danny Johnson was with Mr. Braseel and confirmed when Mr. Braseel left; and

          b)  Evidence that Robin Smith was with Mr. Braseel and confirmed when Mr. Braseel left.

     ii.     Evidence that Adam Braseel was with Jake Baum and Kristen King in Coalmont, Tennessee for five to fifteen minutes between 9:15 p.m. and 10:00 p.m., including the statement of Jake Baum.

     iii.     Evidence that Adam Braseel arrived at Josh Seagroves home, arriving at 10:00 p.m. and remained with friends the rest of the night, including the statement of James Brown and Darren Nunley who confirmed that Mr. Braseel arrived at Mr. Seagroves house between 9:00 and 10:00 p.m. on the night of January 7.

    c.  Trial counsel also failed to conduct forensic investigation to establish proof confirming the alibi defense or establishing a reasonable doubt about Adam Braseel's guilt, including, but not limited to, the failure of counsel to investigate and present the following evidence:

i. Fingerprints from the crime scene which were not identified as being from Adam Braseel, including at least one latent print, and which clearly did not come from Adam Braseel, which were never identified by the authorities, and which were not fully investigated to support the defense;

ii. A small baseball bat, which was possibly a weapon in the case, was improperly moved by authorities after recovery, thus destroying critical evidence, including evidence related to the fact that Kirk Braden had handled the weapon following the assault; and

iii. Forensic evaluation of items, which were not independently evaluated and whose samples were degraded by the time of post-conviction proceedings, including but not limited to:

a) Sundrop bottle near crime scene;

b) Glass bottle near Malcolm Burrows' body;

c) Cup near Malcolm Burrows' body;

d) Glass bottle near Malcolm Burrows' body;

e) Pepsi bottle from Malcolm Burrows' residence;

f) Cans from kitchen floor of Malcolm Burrows' residence;

g) Trash from living room of Malcolm Burrows' residence;

h) Ball cap from Adam Braseel; and

i) Clothing of Malcolm Burrows.

d. Trial counsel failed to secure the assistance of a forensic pathologist to assist in the defense of the case, to investigate the time of death and the circumstances of the victim's death or assaults, to establish proof inconsistent with the prosecution's theory and to establish a

defense of alibi or reasonable doubt, and to cross-examine the prosecution's experts about various issues, including but not limited to: time of death, the length of the struggle, and that there would have been large amounts of blood on the actual perpetrator.

      e.  Counsel failed to investigate or challenge the results of examinations of testing done on forensic evidence by the Tennessee Bureau of Investigation (T.B.I.), including but not limited to serology evidence, hair and fiber evidence, and whatever other analyses may have been done by its laboratory.

      f.  Trial counsel failed to move to suppress or to object at trial regarding the eyewitness identifications by Becky Hill and Kirk Braden, which motion would likely have been granted and such evidence's absence would have resulted in reasonable doubt regarding Adam Braseel's participation in the crimes; the eyewitness identifications provided by Ms. Hill and Mr. Braden were the only evidence which connected Adam Braseel to the crimes. The eyewitness identifications should have been excluded for the following reasons:

           i.  The eyewitness identification of Becky Hill was both unreliable and inaccurate and, thus, should have been excluded:

              a)  Becky Hill only viewed her attacker for a matter of minutes;

              b)  She sustained massive head trauma shortly after viewing her attacker and was unconscious for several days after the incident;

              c)  She did not describe her attacker for five days following the incident, due to her injuries which impacted her cognitive ability;

              d)  While heavily medicated, Hill spoke with investigators regarding the attack while in the hospital and at her sister's house;

              e)  At the preliminary hearing a month after the attack, Hill testified

that she viewed the photographic line up at her sister's house along with photographs of Adam Braseel's vehicle, and that she made her identification then;

f) At the trial, in contrast, Hill testified that she made her identification from a photographic line up at the jail.

g) Lonnie Cleek testified that Hill was in no condition to make an identification at her sister's house.

h) Lonnie Cleek testified that Hill identified another man, not Adam Braseel, as her attacker in the photographic line up.

i) The photographic line up contained dissimilar pictures of men so as to be unduly suggestive, in that it contained:

   i) Men of different ages;

   ii) Men with different hair styles;

   iii) Men who were clean shaven and bearded; and

   iv) Only some men who wore jewelry.

j) Hill's impairment due to her injuries and use of pain medication, as well as the suggestiveness of the photographic line-up, renders her identification both unreliable and inadmissible.

ii. The eyewitness identification of Kirk Braden was both unreliable and inaccurate and, thus, should have been excluded:

a) Kirk Braden viewed his attacker for a matter of seconds;

b) Braden's interaction with the attacker was highly chaotic;

c) Braden did not identify the attacker for several days following the

incident;

d) Braden gave conflicting accounts of the attack, telling officers that he saw his attacker leave in a vehicle while telling neighbor Mr. White that the attacker left on foot running up the road;

e) The photographic identification by Kirk Braden was impermissible suggestive and unconstitutional in that it constituted a single photo lineup:

    i)   Kirk Braden walked into Sheriff Myers' office and observed the open case file spread across the desk;

    ii)  He sat down and saw the photograph of Adam Braseel on top of the contents of the file;

    iii)  At that point he identified Adam Braseel as his attacker;

    iv)  Only then did Sheriff Myers attempt to show Mr. Braden additional photographs which were on the desk;

    v)  The stack of photographs as purportedly shown to Mr. Braden has not been maintained and Sheriff Myers used the photographs in whole or in part to construct the line-up shown to Hill;

    vi)  The line-up was essentially a single photo line-up which is constitutionally impermissible.

f) The weakness of Mr. Braden's identification, as well as the

suggestiveness of the photographic line-up, renders his identification both unreliable and inadmissible.

iii.   The photographic line-up shown to Hill, and allegedly to Braden, contained dissimilar pictures of men so as to be unduly suggestive, in that it contained:

    a)  Men of different ages;

    b)  Men with different hair styles;

    c)  Men who were clean shaven and bearded; and

    d)  Only some men who wore jewelry;

    e)  Accordingly, the line-up was unconstitutionally suggestive and a due process violation.

iv.   The photographic identification by Kirk Braden was impermissible suggestive and unconstitutional in that it constituted a single photo lineup:

    a)  Kirk Braden walked into Sheriff Myers' office and observed the open case file spread across the desk;

    b)  He sat down and saw the photograph of Adam Braseel on top of the contents of the file;

    c)  At that point he identified Adam Braseel as his attacker;

    d)  Only then did Sheriff Myers attempt to show Mr. Braden additional photographs which were on the desk;

    e)  The stack of photographs as purportedly shown to Mr. Braden has not been maintained and Sheriff Myers used the photographs in whole or in part to construct the line-up shown to Ms. Hill;

f) The line-up was essentially a single photo line-up which is constitutionally impermissible and should have been suppressed on that basis alone.

g. Trial counsel failed to challenge or object at trial to the vehicle identification by Angela White, which motion would likely have been granted; the absence of such identification would have resulted in reasonable doubt regarding Adam Braseel's participation in the crimes. The identification should have been excluded or limited by a qualified eyewitness identification expert for the following reasons:

i. Ms. White testified that the car she saw was a "gold, shiny, new model car";

ii. The car driven by Adam Braseel was a late model car with front-end damage;

iii. Ms. White testified at trial that she saw the vehicle on January 6, 2006;

iv. At the post-conviction hearing, Ms. White clarified that she was misled by the prosecution's statement of the date and assumed she was discussing the date that Malcolm Burrows' body was found;

v. Ms. White's identification of the photograph of Mr. Braseel's car as like the car she saw was not reliable and should have been excluded by pre-trial motion or by cross-examination.

h. Trial counsel failed to secure the assistance of an eye witness expert to assist in the defense of the case, to limit the impact of the highly flawed eye witness identifications in the case, to establish proof inconsistent with the prosecution's theory, and to establish reasonable doubt, including but not limited to:

i.   Evidence that erroneous identification accounts for as much as eighty-five percent of the convictions of those individuals later exonerated by DNA testing. *See State v. Copeland*, 222 S.W.3d 287, 299 (Tenn. 2007) citing with approval *The Role of the Social Sciences in Preventing Wrongful Convictions*, 42 Am. Crim. L. Rev. 1271, 1273 (2005);

ii.   Recall of an event such as a crime is an active, reconstructive process susceptible to manipulation by post-event occurrences and information from law enforcement officers, other eyewitnesses, the media, and others that fill in the gaps in the eyewitness's memory of the crime. *See How to Analyze the Accuracy of Eyewitness Testimony in Criminal Cases*, 42 Conn. L. Rev. 435, 455-56 (2009).

iii.   The ways in which the presence of a weapon or a simple disguise, such as a hat, can prevent an individual from recognizing someone or providing accurate eyewitness identification. K.E. Patterson & A.D. Baddeley, *When Face Recognition Fails*, 3 J. Experimental Psychol: Hum. Learning & Memory 406, 416 (1977).

iv.   The inability of witnesses to realize that their memory of an eyewitness encounter could be compromised by post-event information. Curt R. Bartol & Anne M. Bartol, *Psychology and Law: Theory, Research, and Applications*, 228 (3d ed. 2004).

i.   Trial counsel failed to adequately cross-examine witnesses to assist in the defense of the case, to limit the impact of the highly flawed eyewitness identifications in the case, to establish proof inconsistent with the prosecution's theory, and to establish reasonable doubt,

including by:

      i.     Cross-examining Kirk Braden regarding his identification of Adam Braseel.

      ii.     Cross-examining Lonnie Cleek regarding inconsistencies with respect to the eye witness identifications, including:

           a)  Ms. Hill's original identification at her sister's house; or

           b)  Her selection of an individual other than Adam Braseel in the photographic lineup.

      iii.    Cross-examining Sheriff Myer regarding the construction of the line up or Kirk Braden's identification.

   j.   Trial counsel failed to limit the impact of the highly flawed eyewitness identifications in the case and to establish reasonable doubt, by requesting that the jury charge include an instruction regarding the identity of a defendant as set forth in Tennessee Pattern Jury Instruction – Criminal 42.05, the failure to provide such instruction is plain error, which includes the following indispensable instructions in a case such as this where the identity of the perpetrator was the paramount if not singular issue:

      i.     Instruction that the state has the burden of proving identity beyond a reasonable doubt;

      ii.     Instruction that the value of the identification depends on consideration of the following factors:

           a)  The witness' capacity and opportunity to observe the offender. This includes, among other things, the length of time available for observation, the distance from which the witness observed, the

lighting, and whether the person who committed the crime was a prior acquaintance of the witness;

b) The degree of certainty expressed by the witness regarding the identification and the circumstances under which it was made, including whether it is the product of the witness' own recollection;

c) The occasions, if any, on which the witness failed to make an identification of the defendant, or made an identification that was inconsistent with the identification at trial;

d) The occasions, if any, on which the witness made an identification that was consistent with the identification at trial, and the circumstances surrounding such identifications; and

e) Any other factors fairly raised by the evidence, such as expert witness identification testimony.

iii. Instruction that the state's burden specifically includes the identity of the defendant as the person who committed the crime for which he is on trial.

iv. Instruction that if after considering the identification testimony in light of all the proof the juror has a reasonable doubt that the defendant is the person who committed the crime, she must find the defendant not guilty.

k. Trial counsel failed to individually poll the jurors, which would have revealed that Juror 1 did not agree that Adam Braseel was guilty of the crimes for which he had been charged. Due to the amount of distress expressed by Juror 1 in the courtroom as the verdict was read, it should have been clear to defense counsel that questioning of the jurors was necessary which would have revealed that the jury's verdict was not unanimous.

l.   Counsel did not exclude jurors who had preexisting relationships with the witnesses and the victims in the case, which resulted in individuals on the jury, such as the jury foreman, who were not able to evaluate the evidence in an impartial manner.

m.   Trial counsel failed to object to the use of leading questions during the direct examination of Hill and Braden, which allowed the prosecution to advance its theory of how the crimes were accomplished, without eliciting true and uninfluenced testimony from the witnesses, including testimony regarding:

     i.       The size and shape of the weapon used;

     ii.      The description of the perpetrator;

     iii.     The description of the perpetrator's vehicle; and

     iv.     The timeline of events during the night of January 7, 2006.

n.   Trial counsel failed to object to the introduction of hearsay testimony within the testimony of Officer West during which the prosecution effectively introduced the incident report created by Officer West by way of the prosecution's reading of the report into the record. Adam Braseel could not confront the statements of the witnesses included in the report because they were hearsay statements of Officer West. Consequently, they were admitted in violation of Adam Braseel's right to contront the witnesses against him and his rights to due process and a reliable guilt and sentencing determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

o.   In all of the above stated claims, counsel's subjective decision-making and conduct was objectively unreasonable and amounted to constitutionally ineffective representation, and in each instance, Mr. Braseel was prejudiced by each display of constitutionally ineffective conduct and decision-making.

**B.** ***Due Process Violations for Failure to Disclose Exculpatory Evidence, Presentation of False Testimony and Evidence, and Failure to Correct Knowingly False Testimony and Evidence.***

66.     "While [a prosecutor] may strike hard blows, he is not a liberty to strike foul ones." *Berger v. United States,* 295 U.S. 78, 88 (1935). In violation of the Fourteenth Amendment, the proceedings against Adam Braseel violated the guarantees of fundamental fairness under the Due Process Clause. The State's behavior related to the wallet found on Malcolm Burrows body by Sergeant Brown constitutes such a violation of fundamental fairness resulting in the conviction of Adam Braseel, an innocent man, as follows:

a.   The State knowingly misrepresented evidence as prohibited in *Miller v. Pate*, 386 U.S. 1 (1967):

i.      Sergeant Brown discovered a wallet in the back pocket of Malcolm Burrows at the time he discovered the body;

ii.     Sergeant Brown left the scene in the control of Agent Davis and Sheriff Myer;

iii.    The wallet was never catalogued into evidence and Sergeant Brown was taken off the case;

iv.    Sheriff Myer later represented that he was never at the scene and never collected any evidence;

v.     Sergeant Brown was instructed by the State that he need not testify at trial; and

vi.    Leading up to and through trial, the prosecution represented that Malcolm Burrows was killed in the course of a robbery wherein his wallet was stolen; and

vii.   This was a misrepresentation of the evidence constituting a violation of

fundamental fairness under the Due Process Clause.

b. The State presented false or misleading testimony, as prohibited by *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935):

    i.    Sergeant Brown discovered a wallet in the back pocket of Malcolm Burrows at the time he discovered the body;

    ii.    Numerous witnesses from the Grundy County Sheriff's Department testified that there was no wallet found on the body;

    iii.    Further, the presented the false and misleading testimony of Agent Davis and Sheriff Myers that claimed that Sheriff Myers was not at the scene of the crime;

    iv.    The new testimony regarding the disappearance of the wallet subsequent to Sergeant Brown leaving the scene in the custody and control of Agent Davis and Sheriff Myers demonstrates that the testimony regarding Sheriff Myer's whereabouts was not an incidental inconsistency, but was an intentional misrepresentation meant to obscure the wallet's disappearance.

c. The State failed to correct false testimony as prohibited by *Napue v. Illinois*, 360 U.S. 264 (1959):

    i.    Incorporating the facts set forth at ¶ 66(b);

    ii.    If the State did not intentionally solicit or present false testimony, at the very least it failed to correct false testimony due to the fact that the wallet was indeed found on the body by the Grundy County Sheriff's Department.

d. The State withheld materially exculpatory evidence in violation of *Brady v.*

*Maryland*, 373 U.S. 83 (1963):

      i.      Sergeant Michael Brown discovered Malcolm Burrows' wallet was in his back pocket at the time his body was found;

      ii.     Sergeant Brown and Sheriff Myers were members of the prosecution team;

     iii.     The wallet was never catalogued into evidence and its existence was not disclosed to defense counsel;

     iv.     Sergeant Brown was instructed by the State that he need not testify at trial; and

      v.     The absence of the wallet and the false testimony of Sheriff Myers that he was not ever at the crime scene indicates that killing and assaults were not motivated by robbery but were, instead, covered up after the fact by Grundy County officials.

    e.  The State has withheld materially exculpatory evidence that it discovered after sentencing by destroying the files related to the Braseel case.

### C.    *Additional Violations and Errors Deprived Mr. Braseel of Other Constitutional Rights.*

    67.    In violation of the Sixth, Eighth, and Fourteenth Amendments, the prosecution engaged in improper and unconstitutional arguments, including arguments unsupported by the record stating that the jury should find Adam Braseel guilty of the crimes for which we was charged if he participated in those crimes as an accomplice.

    68.    The failure to charge the jury regarding the State's burden of proof with respect to the identity of the perpetrator as set forth in TPI-Criminal 42.05 was unconstitutional because it lessened the prosecution's burden under the Sixth, Eighth, and Fourteenth Amendments, and

jurors did in fact apply a lower standard, including:

  a. Evidence that jurors found Adam Braseel guilty because they believed he had knowledge of the crimes and not because they believed that he committed those crimes; and

  b. Evidence that jurors found Adam Braseel guilty because he could "fix" the incorrect verdict on appeal.

  69. Adam Braseel's convictions violate the Fourteenth Amendment because the jury's verdict was not unanimous:

  a. Juror 1 believed that Mr. Braseel was innocent;

  b. Juror 1 never agreed in deliberations that Mr. Braseel was guilty, and never wrote down or signed anything that said that Mr. Braseel was guilty;

  c. When the jury went out together into the courtroom as the verdict was read, Juror 1 was distraught and in tears;

  d. Defense counsel did not orally poll each juror individually; and

  e. Juror 1 does not recall ever raising her hand to indicate that she agreed with the verdict.

  70. In violation of the U.S. Constitution, jurors were given documents and items to consider in deliberations which were not presented during trial or admitted into evidence, including tape recordings of interviews.

  71. In violation of U.S. Constitution, Adam Braseel is actually innocent of the charges for which he was convicted. It is more likely than not that no reasonable juror would have convicted Adam Braseel in light of new evidence that Malcolm Burrows was not killed in the course of a robbery, indicating that the crimes were not motivated by robbery as argued at trial and that person(s) subsequently covered up the true motive of the crimes, including:

a.  New evidence from Sergeant Michael Brown demonstrating that Malcolm Burrows' wallet was in his back pocket at the time his body was found;

b.  The wallet was never catalogued into evidence and its existence was not disclosed to defense counsel — its nondisclosure also violates due process under Brady, at both the guilt and sentencing phases of trial;

c.  The absence of the wallet and the false testimony of Sheriff Myers that he was not ever at the crime scene indicate that the killing and assaults were not motivated by robbery but were, instead, covered up after the fact by Grundy County officials;

d.  Evidence of alibi witnesses not presented at trial; and

e.  Evidence of another perpetrator who committed the crimes.

72.     In violation of the Fifth and Fourteenth Amendments, the evidence is insufficient to support the jury's guilty verdict based upon the foregoing, there is insufficient evidence that Adam Braseel is the individual who committed the crimes for which he was charged and convicted.

73.     In violation of the Sixth, Eighth, and Fourteenth Amendments, the cumulative effect of the errors at the guilt and sentencing phases of trial rendered the guilt and sentencing determinations unfair, unconstitutional, and unreliable.

## VII.    CONCLUSION

74.     Wherefore, this Court should grant Petitioner Adam Braseel's petition for writ of habeas corpus and order that he be discharged from the unconstitutional custody under which he now labors, and order that he be discharged from custody unless retried and resentenced within a reasonable period of time. The Court should grant Petitioner any requested discovery or process needed for the investigation and full presentation of his claims of constitutional deprivation.

## VIII.  NOTICE OF DEFENSES

75.     As to claims decided on the merits by the state courts in underlying proceedings, Mr. Braseel avers that such decisions are contrary to clearly established federal law. Mr. Braseel further avers that such decisions involve an unreasonable application of clearly established federal law. Mr. Braseel also avers that such decisions involve an unreasonable application of the facts.

76.     As to the issue of procedural default, Mr. Braseel states the following: First, defenses of non-exhaustion and procedural default are affirmative defenses, which must first be raised by Respondent. Respondent is free to waive procedural defenses and proceed on the merits of claims.

77.     Should Respondent choose to defend against any claim by raising the defense of non-exhaustion or other procedural default, Mr. Braseel will defend against such claim by raising, *inter alia*, that he has cause for and was prejudiced by any procedural default owing to ineffective assistance of trial, appellate, and/or post-conviction counsel and failure to address will result in a miscarriage of justice.[6]

78.     Mr. Braseel further reserves the right to defend against such allegations on the ground of prosecutorial misconduct and/or other interference by state actors, which prevented his from presenting his claims previously.

79.     Further, to the extent that any error found by this Court is subject to harmless error review, Mr. Braseel avers that such error(s), individually and cumulatively, had a

---

[6]     The United States Supreme Court has not yet recognized the right to effective assistance of counsel as a standalone claim for which federal habeas relief may be granted. Mr. Braseel hereby gives notice that if the Supreme Court should recognize such a right as an independent claim for habeas relief, as opposed to an equitable defense to procedural default, he will seek to amend her petition to raise such a claim which should relate back to the filing date of this petition. *Compare Martinez v. Ryan*, 132 S.Ct. 1309 (2012).

substantial and injurious effect on the verdict and sentence in this case.

80.     This statement of defenses is not complete and Mr. Braseel reserves the right to defend against any allegations by Respondent based on the law and facts, as they exist at the time.

**IX.     PRAYER FOR RELIEF**

81.     For the foregoing claims enumerated herein, Adam Braseel prays this Honorable Court to:

A.  Order the State to file an Answer to this Petition;

B.  Allow Petitioner to further Amend the petition, if appropriate;

C.  After permitting a reasonable time for discovery, this Court hold an evidentiary hearing on all procedural and substantive matters as to which there are factual disputes in Adam Braseel's case;

D.  Grant Adam Braseel an unconditional writ of habeas corpus;

E.  Grant Adam Braseel a conditional writ of habeas corpus; and

F.  Grant any other relief the Court deems necessary and appropriate.

Respectfully submitted,

**BONE McALLESTER NORTON PLLC**

 s/J. Alex Little
J. Alex Little (#029858)
Mandy Strickland Floyd (# 031123)
511 Union Street, Suite 1600
Nashville, TN  37219
(615) 238-6300 (phone)
(615) 238-6301 (fax)
alex.little@bonelaw.com
mfloyd@bonelaw.com

*Counsel for Petitioner*

38

I declare (or certify, verify, or state) under penalty of perjury that the Habeas Corpus Petition is true and correct.

Executed (signed) on ___5·23·17___ (date).

_____ #452115

**Signature of Petitioner**

01546549.docx.v1-5/22/17