## IN THE CIRCUIT COURT FOR GRUNDY COUNTY, TENNESSEE
### AT ALTAMONT

ADAM BRASEEL,       )

      *Petitioner,*       )

v.       )

STATE OF TENNESSEE,       )

      *Respondent.*       )

)

FILED IN MY OFFICE 12:50 A.M. P.M.

13 DAY OF Feb , 20 19

Penny Sems / SM

**CLERK**

Case No. 4221
(POST-CONVICTION)

TRIAL COURT NO.: 4221

---

## AMENDED PETITION FOR WRIT OF ERROR *CORAM NOBIS*

---

Petitioner Adam Braseel stands before this Court wrongfully convicted of murder and sentenced to life in prison for a crime he did not commit. Pursuant to Tennessee Code Annotated § 40-26-105, through counsel, he files this amended petition for writ of error *coram nobis*. For the reasons in this petition, and those to be presented in any subsequent pleading or hearing, this Court should grant the writ, set aside the judgment of conviction, and order a new trial.

### SUMMARY

Mr. Braseel did not murder Malcolm Burrows. The evidence the State introduced at trial to argue that he did was weak. It primarily consisted of two meager pieces of evidence: (i) identification by two strangers who were shown photographs by police in a suggestive manner, and (ii) identification by those witnesses of the perpetrator's vehicle, which resembled a vehicle owned by Mr. Braseel's mother. There was no physical evidence connecting Mr. Braseel to the crime. On the contrary, the State's investigation determined that the physical evidence it found (a fingerprint on the passenger door of the decedent's vehicle) did not match anyone it could identify. To explain why Mr. Braseel murdered Mr. Burrows—a man he did not know—

**EXHIBIT 1**

the State claimed that the murder was a robbery gone bad. To justify this motive, it elicited testimony that no wallet was found on the body of Mr. Burrows.

We now know that none of this is true. Newly discovered evidence flatly destroys the government's case and makes clear that—had the new evidence been admitted at trial—the jury's verdict would have been different. There are five pieces of new evidence, none of which was known to Mr. Braseel or his counsel at the time of his trial, and which was only recently discovered.

*First*, the fingerprint found at the scene of the crime *did* match someone, an individual named Kermit Bryson, who had a family connection to Mr. Burrows. (Mr. Bryson was dating a woman raising a child Mr. Burrows considered to be a grandchild.)

*Second*, Mr. Bryson was not just a random citizen. He was a violent felon with a long criminal record who killed a police officer and, later, killed himself when the police were closing in on him.

*Third*, not only was Mr. Bryson the kind of man who would have killed Mr. Burrows in cold blood, but he matched the description given by the eyewitnesses. His photograph and that of Mr. Braseel are strikingly similar.

*Fourth*, not only was Mr. Bryson a violent killer who matched the description of the assailant given by the witnesses, and whose fingerprint placed him in the passenger seat of Mr. Burrow's car at the time Mr. Burrow was killed beside it, the vehicle he likely drove at the time *also* fit the description provided by the witnesses. Incredibly, the car owned by Mr. Bryson's girlfriend looks nearly identical to the car owned by Mr. Braseel's mother, which the State claimed Mr. Braseel drove to commit the crime. It even had front end damage.

*Fifth*, and finally, there was no robbery. Contrary to the testimony elicited by the State at

2

trial, the wallet of Mr. Burrows was *not* missing. It was in his back pocket at the time police arrived on the scene and discovered his body. Sergeant Mike Brown found it there, as he confirmed in a sworn affidavit. Neither the Sheriff nor any other deputy logged it into evidence, and the officers kept mention of the wallet out of any police report.

To summarize: The motive that allegedly led Mr. Braseel to murder Mr. Burrows was based on false (or, at least, mistaken) testimony. There is physical evidence placing a cop-killer at the scene of the crime. The appearance of this violent man matched exactly the description provided by the eyewitnesses. And this known-murderer, who was present at the scene, and who was connected to Mr. Burrows through his girlfriend, drove a car that looked exactly as the eyewitnesses described.

This case falls squarely within the small window of cases that the writ of error *coram nobis* was designed to address. The new evidence described in this petition (i) consists of facts that existed, but were not yet ascertained, at the time of the trial; (ii) are admissible; and (iii) are credible. The new evidence could not have been discovered earlier because the fingerprint report was only disclosed by the State a few short months ago, and counsel diligently discovered evidence of Mr. Bryson's appearance and his girlfriend's vehicle in the intervening weeks. Had this evidence been introduced at trial, the jury's verdict would have been different. Finally, Mr. Braseel is entitled to equitable tolling of the filing deadline because the grounds are "later arising" grounds and, if the statute of limitations were applied strictly, it would deprive him a reasonable opportunity to present these compelling claims.

Case 4:17-cv-00027-CLC-SKL   Document 23-1   Filed 02/19/19   Page 3 of 60   PageID #: 100

## PROCEDURAL BACKGROUND

1.      Adam Braseel was convicted of first-degree murder, first-degree felony murder, especially aggravated robbery, attempted first degree murder, and aggravated assault in Grundy County, Case No. 4221. The Circuit Court for Grundy County, located in Altamont, Tennessee, sentenced Mr. Braseel to life imprisonment with the possibility of parole for his convictions for first degree murder, which was merged with his conviction for felony murder. Mr. Braseel was sentenced to fifteen (15) years imprisonment for his conviction for especially aggravated robbery of Malcolm Burroughs. In addition, Mr. Braseel was sentenced to fifteen years imprisonment for the attempted murder of Rebecca Hill, and three (3) years for his conviction for the aggravated assault of Rebecca Hill. Finally, Mr. Braseel was sentenced to eleven (11) months and twenty-nine (29) days for his conviction for the assault of Kirk Braden. These sentences were ordered to run concurrently with each other.

2.      On direct appeal, the Tennessee Court of Criminal Appeals affirmed Mr. Braseel's convictions for first degree murder, especially aggravated robbery, and assault, but remanded the case so that the judgment of conviction appropriate reflected the merger of Count I (first degree murder) and Count II (first degree felony murder); the Court also remanded to merge Count IV (attempted murder of Rebecca Hill) and Count V (aggravated assault of Rebecca Hill). *See State v. Braseel*, No. M2009-00839-CCA-R3-CD, 2010 WL 3609247 (Tenn. Crim. App. Sept. 17, 2010), *perm. to appeal denied*, Feb. 17, 2011.

3.      Mr. Braseel's Application for Permission to Appeal to the Tennessee Supreme Court was denied. *State v. Braseel*, No. M2009-0839-SC-R11-CD (Feb. 17, 2011) (per curium).

4.      Mr. Braseel's Petition for Relief from Conviction and Sentence was filed on February 14, 2012. On review, the trial court granted Mr. Braseel relief and ordered a new jury

4

trial. The post-conviction trial court concluded that Mr. Braseel did not receive effective assistance of counsel at the jury trial due to trial counsel's failure to move to suppress the identification of Mr. Braseel by Rebecca Hill and Kirk Braden.

5. The State appealed from the post-conviction trial court's judgment. The Court of Criminal Appeals found that the evidence preponderated against the factual findings of the post-conviction court and reversed its judgment. *Braseel v. State*, No. M2016-00057-CCA-R3-PC (Tenn. Crim. App. Oct. 7, 2016). Mr. Braseel's application for permission to appeal was denied by the Tennessee Supreme Court on February 24, 2017.

6. After discovering new evidence deflating the State's theory that the murder of Mr. Burrows was a botched robbery, Mr. Braseel filed a Petition for a Writ of Error *Coram Nobis* on May 23, 2017. In the initial petition, Mr. Braseel argued that the newly discovered evidence would have resulted in a different outcome at trial. The State filed its Motion to Dismiss the Petition for Writ of Error *Coram Nobis* in June of 2017 on grounds that it was untimely and that Mr. Braseel was not entitled to equitable tolling of the statute of limitations. Mr. Braseel filed a Memorandum in Opposition to the State's Motion to Dismiss on August 1, 2018, and it remained pending when the State disclosed further new evidence to Mr. Braseel's counsel.

7. In addition, pursuant to an alternative theory, Mr. Braseel filed a Motion for Status Conference before this Court on February 22, 2018 on grounds that only two of the issues raised by his original post-conviction petition were decided. The State filed a Memorandum Regarding the Request for a Status Conference on May 16, 2018. In it, the State took the position that all matters in the original post-conviction petition were concluded.

8. To preserve his rights with respect to the original post-conviction petition, Mr. Braseel filed a Petition for Writ of Habeas Corpus with the U.S. District Court for the Eastern

District of Tennessee on May 23, 2017. There, the petition was stayed at the request of Mr. Braseel pending resolution of the (1) Motion for Status Conference and (2) Petition for a Writ of Error *Coram Nobis*.

9. In October 2018, as further described below, the State disclosed additional new and exculpatory evidence to defense counsel for Mr. Braseel, which prompted Mr. Braseel to ask this Court for a scheduling order for amending his Petition for a Writ of Error *Coram Nobis*. In a series of orders, this Court set deadlines in this matter, including a hearing to occur on June 26, 2019, and a deadline for the Amended Petition for A Writ of Error *Coram Nobis* to be filed by February 9, 2019.

## FACTUAL BACKGROUND

### *Mr. Braseel was in Coalmont, Tennessee at the time the crimes occurred.*

10. In January 2006, Adam Braseel was a young man starting out in life. Trial Tr. III at 296-99.[1] Mr. Braseel was raised in Grundy County but had moved to Manchester, Tennessee following high school graduation. *Id.* at 297. In the years since moving to Manchester, Mr. Braseel had returned to Grundy County only on occasion, visiting a total of five or six times to ride four wheelers and to visit with friends. *Id.* at 298.

11. On the morning of Friday, January 6, 2006, Mr. Braseel got off work and returned to Grundy County to visit a friend, Charles Partin, in Coalmont, Tennessee. Trial Tr. III at 300-01. Mr. Braseel spent a day and a half visiting with Partin, leaving around 9:15 or 9:30 in the evening on Saturday, January 7, 2006. *Id.* at 301; Trial Tr. II at 234; P.C. Tr. at 30. Danny Johnson and Robin Smith were with Mr. Braseel at Partin's home and confirmed that Mr. Braseel left the house between 9:00 and 9:15 p.m. P.C. Tr. at 36, 40.

---

[1] For reference, "Trial Tr." refers to the transcript of the original trial of Mr. Braseel. It consists of multiple volumes, which are referenced before the specific page number of each.

12.     Mr. Braseel met up with friend Jake Baum and Baum's girlfriend, Kristen King, in the Coalmont church parking lot to talk and visit. Trial Tr. III at 302-03; Trial Tr. II at 278; P.C. Tr. at 43. After talking with the two for around five to fifteen minutes, Mr. Braseel drove to the home of friend, Josh Seagroves, arriving at 10:00 p.m. Trial Tr. III at 302-03; Trial Tr. II at 287-90.

13.     When Mr. Braseel greeted Seagroves, he was his normal self—he was not upset and did not appear as if anything out of the ordinary had occurred prior to his arrival. Trial Tr. III at 304. Mr. Braseel then went four-wheeling with Seagroves and other friends and spent the night at Seagroves' home. Trial Tr. III at 302-03; Trial Tr. II at 287-90. James Brown and Darren Nunley confirmed that Mr. Braseel arrived at Seagroves house between 9:00 and 10:00 p.m. on the night of January 7. P.C. Tr. at 65, 72.[2] Mr. Braseel did not travel to Mellisa Rock Road or any other location in Tracy City that night. Trial Tr. III at 311.

### The crimes which occurred on Mellisa Rock Road.

14.     While Mr. Braseel was visiting with friends in Coalmont, a dark scene was unfolding on Mellisa Rock Road—a fifteen to twenty minute drive away. *See* Trial Tr. II at 182. According to Rebecca Hill, she was at home with her brother, Malcolm Burrows, and her son, Randy Kirk Braden, when a man came to the door and asked for help with car trouble. Trial Tr. I at 36. Hill agreed, when it was suggested by the prosecutor, that the man arrived at 9:00 or 9:15 on the night of January 7. *Id.*

15.     Burrows, according to Ms. Hill, spoke with the man for about three or four minutes, agreed to help him, and left with the man in Hill's vehicle. *Id.* at 36, 48. Ms. Hill reported that the man returned to the house alone about twenty minutes later and informed her

---

[2]     For reference, "P.C. Tr." refers to the transcript of the evidentiary hearing this Court held on the post-conviction petition for relief filed by Mr. Braseel.

that Burrows had sent him back for starter fluid. *Id.* at 37. When Hill reached under the sink to look for the starter fluid, the man began to hit her about the head and back with "a tire tool or something." *Id.* at 41. The man was not wearing gloves, according to Hill. *Id.* at 53.

16.     Randy Kirk Braden, the adult son of Hill, testified that he was asleep when he heard his mother screaming. *Id.* at 70-72. In Braden's account, he rushed from the bedroom to find his mother being attacked. *Id.* at 72. The man, Braden said, was holding a "sharp object" standing over Hill. *Id.* Braden reported that he pulled the man off of Hill and the man threw a fire extinguisher from under the sink at Braden, hitting him in the right shoulder; the man then ran out of the side door of the house. *Id.* at 73-74. Braden reported that he provided some ice to his mother, and then ran outside to observe the man leave in a car with a sunroof and front-end damage. *Id.* Braden identified the man as having red hair and that he was wearing a ball cap.

17.     Braden then ran to the home of Tommy Flurry where he called 9-1-1 at 9:52 p.m. *Id.* at 82. He then returned to the house and his mother let him back inside. *Id.* at 84. Braden testified that he then picked up a small baseball bat, which was broken in two, and placed it in a trash can. *Id.* When asked why he had moved the bat, Braden testified: "I couldn't really tell you." *Id.* at 85.

18.     Jeffrey White, a neighbor, stopped by the Burrows house that night to ask Kirk Braden about what had taken place; he was fearful that a violent man was on foot in the neighborhood. Trial Tr. I at 109. According to Mr. White, Braden told him that the man ran up the road after the assault rather than leaving in a car; Mr. White remembered this account because it confirmed his fear that a dangerous individual was loose in the neighborhood. *Id.*

19.     Sergeant Michael ("Mike") Brown, a night patrol sergeant for the Grundy County Sheriff's Department, responded to the call for emergency assistance. *Id.* at 91; *see* Exhibit 2,

8

Decl. of Michael Brown ¶ 3. When he arrived at the house, he spoke with Hill and Braden who reported that they had been assaulted prior to his arrival. Brown Decl. ¶ 4.

20.     After the ambulance arrived, Sergeant Brown left the home and stopped by the vehicle that Mr. Burrows had reportedly taken. Brown Decl. ¶ 4. Sergeant Brown walked up a trail next to the car and discovered the body of Malcolm Burrows. Brown Decl. ¶ 4.

21.     When Sergeant Brown discovered the body, Mr. Burrows was fully clothed. Brown Decl. ¶ 6. His hooded sweatshirt was pulled up above the waistline of his pants, and Sergeant Brown observed that Mr. Burrows' wallet was in his back pocket at that time. Brown Decl. ¶ 6. Sergeant Brown did not remove the wallet or otherwise move the body. Brown Decl. ¶ 6.

22.     Sergeant Brown then called his partner Billy Scissom to return to the scene. Brown Decl. ¶ 7. When he arrived, Sergeant Brown showed him the scene. Brown Decl. ¶ 8. Sergeant Brown then reported the corpse and possible homicide to Dispatch. Brown Decl. ¶ 8.

23.     Sheriff Brent Myers and Tennessee Bureau of Investigation Agent Larry Davis arrived at the scene sometime later, and Sergeant Brown left the two at the scene. Brown Decl. ¶ 9. The wallet then disappeared. It was never logged into evidence nor referenced in any report.

24.     At trial, Agent Davis testified that there was no wallet on Malcolm Burrows' body. Trial Tr. II at 153. This testimony was false.

25.     Agent Davis confirmed in his testimony that Sergeant Brown and his partner Lieutenant Scissom were at the scene when he arrived. *Id.* at 171. Although Agent Davis confirmed Sheriff Myers' presence at the scene during his preliminary hearing testimony, he omitted this fact from his testimony at trial. Prelim. Hr'g at 35; Trial Tr. II at 171. Sheriff Myers

testified that he was in Chattanooga when he was informed of the murder and did not visit the scene. Trial Tr. III at 263-64. That testimony was false.

26.     On January 8, 2006, Chief Deputy Lonnie Cleek informed Agent Davis that Adam Braseel had been developed as a suspect in the crime. Trial Tr. II at 180. There was no evidence produced at trial regarding how Adam Braseel came to be a suspect in the crimes at issue, that he had any real prior relationship with the victims, or that he would have had any motive to kill Malcolm Burrows other than for the purposes of robbing him of his wallet, a wallet it turns out was not, in fact, stolen prior to Sergeant Brown discovering the body.

27.     Only two characteristics tied Mr. Braseel to the crime: (1) he had red hair; and (2) he was driving a gold vehicle. Angela White, a neighbor to Malcolm Burrows, testified that on January 6,[3] she observed an unfamiliar vehicle parked in front of her house facing Burrows' home. Trial Tr. at 100-01. She described the vehicle as a "gold, shiny, new model car." *Id.* at 101. She said that a photograph of Mr. Braseel's car "looked like the car." *Id.* at 102. She could not provide any information about the driver or whether there were passengers in the car. *Id.*

28.     Jay Douglas provided a statement to police that on January 6, 2006, he arrived at Mr. Burrows' residence to find Burrows speaking with a white male, six feet tall, with dark hair over his ears. The man had a blonde woman with him, and the two were driving a tan or gold car. When Sheriff Myers wrote up his notes from Douglas' interview, he changed the description of the individuals in the car. Instead of writing what Douglas communicated—that the occupants of the car were a man with dark hair and a woman with blonde hair—Sheriff Myers wrote: "[Douglas] told me that the subject in the car was a white male between twenty five and thirty years old *with red hair*." This was a false account of Jay Douglas' interview.

---

[3]     Ms. White testified at the post-conviction hearing that she saw the car on January 7, not January 6. P.C. Tr. at 61.

29. Other suspects were not developed in the case. The eyewitness identifications by Rebecca Hill and Kirk Braden were the sole evidence that tied Adam Braseel to the crimes.

30. Defense counsel at trial, Floyd Davis and Robert Peters, did not move to suppress the eye witness identifications of Rebecca Hill or Kirk Braden.

### *The Trial was marked by errors and an absence of credible testimony.*

31. Adam Braseel was tried on November 7-9, 2007. At the trial, the following individuals testified: Rebecca Hill, Kirk Braden, Angela White, Jeffrey White, Chris McBee, Troy Brown, Andrew Martin West, Agent Larry Davis, Dr. Feng Li, Agent Elizabeth Reed, Agent Margaret Bash, Charles Partin, Jr., Lonnie Cleek, Sheriff Brent Myers, Kristen King, Joshua Seagroves, and Adam Clyde Braseel.

32. Sergeant Brown moved out of state following the murder of Malcolm Burrows. Prior to trial, however, Sergeant Brown discovered that the Braseel case was proceeding to trial. Brown Decl. ¶ 10. He contacted the District Attorney's office about testifying at the trial, but they responded that they did not need him to testify because they had it covered. Brown Decl. ¶ 10.

33. At the preliminary hearing, Agent Davis confirmed that he met Sergeant Brown, Sheriff Myers, and Lieutenant Billy Scissom at the crime scene. Prelim. Hr'g Tr. at 35. By trial, however, the testimony had changed; Agent Davis omitted reference to Sheriff Myers's presence at the crime scene. Trial Tr. II at 171. Sheriff Myers, however, specifically testified that he was in Chattanooga with his son who was in the hospital when the murder occurred and that he met Becky Hill at the emergency room when she arrived by helicopter. Trial Tr. III at 263-64. This was false.

34. According to Agent Davis, he did not find anything at the scene that would link anyone to the killing of Malcolm Burrows. *Id.* at 153. The TBI lab, likewise, found nothing in

11

their examination of Mr. Braseel's vehicle that would link him to the crimes. *Id.* at 169. In fact, Agent Davis testified that there was no physical evidence collected—at the two violent crime scenes, on Mr. Braseel's person, in his vehicle, or from any other source—which would connect Mr. Braseel to the crimes at issue. *Id.* at 179-80.

35.    According to Agent Elizabeth Reed, who conducted the latent fingerprint analysis, there were no latent fingerprints which matched Mr. Braseel. Trial Tr. II at 216-17. There were identifiable latent fingerprints recovered, however, for which no match was found at the time. *Id.* at 216. Likewise, Agent Margaret Bash, of the TBI crime lab, testified that she found no blood on Mr. Braseel's baseball cap, his jacket, or gloves; she also found no blood on a tire tool or a stick from Mr. Braseel's vehicle. *Id* at 220-21, 224. She also testified that there was no indication that these items had been cleaned. *Id.* at 227-28.

36.    Even the time and date of Malcolm Burrows's death was not established at trial. According to the testimony of medical examiner Dr. Feng Li, Malcolm Burrows died of multiple blunt force trauma. Trial Tr. II at 201. In response to questioning about whether Burrows could have been in the woods for a week or two, Dr. Li testified that "it is very hard to say . . . how long or how far away this patient died." *Id.* at 203. The only evidence that established the timeline of Malcolm Burrows' death was the testimony of Becky Hill and Kirk Braden.

37.    Neither the defense nor the prosecution called Jay Douglas to testify at trial regarding his identification of a man and woman driving a gold car on January 6, 2006. This testimony would have rebutted the implication from Ms. White's testimony, that it was Mr. Braseel who was at the Burrows residence on January 6. Further, defense counsel failed to cross-examine Sheriff Myers regarding why his report changed the detail regarding the occupants of the gold vehicle.

12

38.     The corruption in Grundy County under Sheriff Myers has shaped the prosecution and post-conviction proceedings in Mr. Braseel's case. The current sheriff, Clint Shrum, stated: "When I took office on September 1, 2014 there was not even a single case file on the Braseel Case at the Sheriff's Office. The question is this; was there something the past administration did not want me to see?" *See* Exhibit 3, Email from Sheriff Clint Shrum.

*Long after trial, new evidence was disclosed and discovered.*

39.     In 2014, investigative journalist David Sale began investigating this case. In February of 2015, Sergeant Mike Brown reached out to Mr. Sale on Facebook wanting to provide information about the case. *See* Exhibit 3.

40.     Sergeant Brown had retired from the Grundy County Sheriff's Department and left the state. After more than a year of trying to make further contact with Sergeant Brown, Mr. Sale spoke with Sergeant Brown. *See* Exhibit 3.

41.     After Sergeant Brown spoke with Mr. Sale, Sergeant Brown prepared and signed a sworn affidavit recounting what he saw at the crime scene. It is attached to this petition as Exhibit 2.

42.     More new evidence followed. This time from the State. In the initial investigation, the Tennessee Bureau of Investigations Nashville Crime Laboratory (hereinafter "TBI Lab") examined latent fingerprints from the scene of the murder of Malcolm F. Burrows on January 7, 2006. *See* Exhibit 5, Official Latent Print Report. The TBI Lab issued its first latent fingerprint report on July 31, 2006. *See* Exhibit 5. Unbeknownst to Mr. Braseel or his counsel, the TBI Lab reexamined latent fingerprints and issued a second report on June 29, 2017. *See* Exhibit 5.

43.     The State of Tennessee, through Assistant District Attorney General Steve Strain, provided defense counsel with the results of the second latent fingerprint report by letter dated

13

October 3, 2018, which was sent via U.S. Mail, over 15 months following issuance of this report. *See* Exhibits 4-5, Letter of ADA Steve Strain and Official Latent Print Report. The letter was received by defense counsel several days after it was sent. Despite the critical importance of its contents, the State did not email or telephone defense counsel about these matters. Nor has the State endeavored to explain why it waited more than fifteen (15) months to provide to defense counsel the latent print report, which links another individual to the crime scene.

44.     The TBI Lab's second report identifies matched prints from Andrew West (one of the responding officers) and Kermit Bryson (now deceased). *See* Exhibit 5. Most notably, the report shows that Kermit Bryson's print matched the one found on the interior passenger door handle of the victim's car. *See* Exhibit 5.

45.     According to the State's letter, Bryson had an extensive criminal history at the time of Malcolm Burrow's murder. He was convicted and incarcerated for Aggravated Burglary, Burglary, Theft, and Escape. Bryson was paroled in September 2003 and released from parole in May, 2005. *See* Exhibit 4. The letter also stated that Bryson is alleged to have killed a deputy sheriff in 2008 and that Bryson killed himself later that same day. *See* Exhibit 4.

46.     With this information, Mr. Braseel's legal team was able to find numerous online news stories covering the manhunt for Bryson for murdering the deputy sheriff. These news stories shared pictures of Bryson, including pictures taken by the state agencies such as the one in Exhibit 6. Kermit Bryson bears an uncanny resemblance to Mr. Braseel in body type, hair color, skin color, and eye color. *See* Exhibit 6.

47.     According to the State's letter, Bryson was not incarcerated at the time of Malcolm Burrows' murder on January 7, 2006. *See* Exhibit 4. Further, according to the State's letter, Bryson has at least one known connection to Malcolm Burrows: Bryson's girlfriend was

raising a child whom Malcolm Burrows considered to be his grandchild. *See* Exhibit 4. In addition, the State's letter indicated that, while Bryson did not own a motor vehicle, he was known to "get a ride with his girlfriend." The State did not disclose the name of Bryson's girlfriend despite admitting that the State recently interviewed her. *See* Exhibit 4.

48.    In February 2019, Mr. Braseel's legal team was able to confirm that a woman named Tina Bretz was Bryson's girlfriend by finding matching residential addresses found in a public records database and viewing the public Facebook accounts of Tina Bretz and Christa Bryson, the daughter of Bryson and Ms. Bretz.

49.    In February 2019, Mr. Braseel's legal team accessed public records from the Tennessee Department of Safety, Title & Registration Division that show that at the time of Malcolm Burrows murder, Ms. Bretz owned a beige 1998 Ford Escort. *See* Exhibit 7. A photo of a car matching the make, model, year, and color of Ms. Bretz's car was found via internet research by Mr. Braseel's legal team is attached as Exhibit 8.

50.    The public records also listed the VIN number of Ms. Bretz's beige 1998 Ford Escort. In February 2019, Mr. Braseel's legal team ran a CarFax inquiry on Ms. Bretz's car based on that VIN number. In response, CarFax reported that in 2000, the front right end of the car was damaged in a collision. *See* Exhibit 9, CarFax Report. There is no indication the damage was fixed prior to the murder of Malcolm Burrows. *See id.*

## THE WRIT OF ERROR *CORAM NOBIS* SHOULD ISSUE

51.    The new evidence presented in this petition, and the contents of this petition, comply with the requirements and standards set forth in Tenn. Code Ann. § 40-26-105(b) and *Nunley v. State*, 552 S.W.3d 800 (Tenn. 2018).

52.    That is, this petition (1) describes with particularity the nature and substance of

the newly discovered evidence; (2) demonstrates that the evidence qualifies as "newly discovered evidence," in that the new evidence is (a) evidence of facts existing, but not yet ascertained, at the time of the original trial, (b) admissible, and (c) credible; (3) demonstrates why the newly discovered evidence could not have been discovered in a more timely manner with the exercise of reasonable diligence; (4) demonstrates how the newly discovered evidence, had it been admitted at trial, may have resulted in a different judgment; and (5) is timely filed because petitioner is entitled to equitable tolling due to "later arising" grounds and the facts of the case, which demonstrate that strict application of the statute of limitations would effectively deny Mr. Braseel a reasonable opportunity to present his claims.

## I.    The Nature and Substance of the Newly Discovered Evidence.

53.    The newly discovered evidence that serves as the basis for this petition consists of five evidentiary facts: (1) the fact that the latent fingerprint recovered from the crime scene was identified by the State as belonging to Kermit Eugene Bryson; (2) the fact that Mr. Bryson had a long and violent criminal history and violent disposition; (3) the fact that the physical appearance of Mr. Bryson matched the description of the perpetrator provided by witnesses and matched that of Mr. Braseel; (4) the fact that the vehicle owned by Mr. Bryson's girlfriend, and which he drove in, matched the description of the vehicle that witnesses described the perpetrator as driving and matched that of the vehicle driven by Mr. Braseel; and (5) the fact that the real perpetrator left Mr. Burrows' wallet behind after the murder, and that the first responding officer saw the wallet in Mr. Burrows' rear pants pocket when he located the body.

54.    With respect to the **first** fact, more specifically, the new evidence consists of a latent fingerprint recovered from the crime scene by the State's investigators, which was developed on the passenger door handle (interior) of the Chrysler Fifth Avenue driven by the

decedent, and later identified by the State's fingerprint examiner as matching the right index (#2) finger of Kermit Eugene Bryson. This evidence is described in more detail in the TBI Official Latent Print Report of 6/29/17, which is attached as Exhibit 5 to this petition. Notably, the Chrysler Fifth Avenue where the fingerprint was found was the vehicle in which Mr. Burrows was driving with his presumed assailant in the front passenger seat shortly before his death. It was also the vehicle located a short distance from where his dead body was recovered.

55.     With respect to the **second** fact, more specifically, the new evidence consists of public records and State investigative records indicating that Kermit Eugene Bryson had a long criminal history that included multiple acts of violence, which (if the fingerprint evidence were known) would have rendered him a prime suspect in the murder of Mr. Burrows and provided the defense with a clear alternative theory of identity. At the time of the murder, Mr. Burrows had convictions for Aggravated Burglary, Burglary, Theft, and Escape, and served time in prison. He was paroled in September 2003 and released from parole in May 2005. In June 2008, the State believes that Mr. Burrows killed a deputy sheriff, Anthony Tate, when Deputy Tate was attempting to serve an arrest warrant on him. Mr. Bryson killed himself later that day.

56.     With respect to the **third** fact, more specifically, the new evidence consists of photographs of Mr. Bryson that demonstrate that he not only fits the eyewitness description of the perpetrator but also closely resembles Mr. Braseel. These photographs are attached as Exhibit 6 to this petition.

57.     With respect to the **fourth** fact, more specifically, the new evidence consists of public records and a photograph of the make, model, and color of the vehicle owned by Tina Bretz, who petitioner's counsel identified through their investigation as the girlfriend of Mr. Bryson at the time of the murder. These records and photographs, as well as a photograph

Case 4:17-cv-00027-CLC-SKL   Document 23-1   Filed 02/19/19   Page 17 of 60   PageID #: 114

introduced at trial of the vehicle driven by Mr. Braseel, demonstrate that the vehicle that Mr. Bryson was known to ride in matches the eyewitness description of the perpetrator's vehicle and matches the one driven by Mr. Braseel. Not only does the vehicle match the color and type, but the vehicle driven by Ms. Bretz (and apparently Mr. Bryson) also had front end damage consistent with the testimony of eyewitnesses. This is apparent from the CarFax report of the vehicle, which indicates that the vehicle suffered front end damage in 2000. These materials are attached as Exhibits 7, 8, and 9 to this petition.

58. With respect to the **fifth** fact, more specifically, the new evidence consists of the testimony of Sergeant Michael ("Mike") Brown, a night patrol sergeant for the Grundy County Sheriff's Department, who was the first responding officer to locate the body of Mr. Burrows. Sergeant Brown will testify, and his affidavit states, that he saw a wallet in the rear pants pocket of Mr. Burrows when he first observed the body. The affidavit of Sergeant Brown to this effect is attached as Exhibit 2 to this petition.

## II.     The Proffered Evidence Is "Newly Discovered Evidence."

59. Consistent with the Tennessee Supreme Court's decision in *Nunley*, 552 S.W.3d at 816, "the proffered evidence [is] (a) evidence of facts existing, but not yet ascertained, at the time of the original trial, (b) admissible, and (c) credible.

### A.     *The Proffered Evidence Existed But Was Not Ascertained at the Time of Trial.*

60. With respect to the **first** fact, regarding the presence of Mr. Bryson's fingerprints at the crime scene, the evidence existed at the time of trial—the fingerprints were present on the interior car door from the date the police scoured the crime scene—but it was unknown at the time of trial that they belonged to Mr. Bryson.

61. With respect to the **second** fact, regarding the criminal history of Mr. Bryson and

his violent tendencies, the evidence existed at the time of trial—he had multiple convictions prior to 2007—but it was unknown at the time of trial that Mr. Bryson was present at the crime scene.

62.     With respect to the **third** fact, regarding the appearance of Mr. Bryson and how closely he resembles both the descriptions of the eyewitnesses and the appearance of Mr. Braseel, the evidence existed at the time of trial—there were photographs of him at that time, and he could have been brought into the courtroom for a live identification procedure before the jury—but it was unknown at the time of trial that Mr. Bryson was present at the crime scene.

63.     With respect to the **fourth** fact, regarding the vehicle that Mr. Bryson had access to and its resemblance to both the descriptions of the eyewitnesses and the appearance of the vehicle driven by Mr. Braseel, the evidence existed at the time of trial—the records of the vehicle existed and the vehicle was in operation and able to be photographed to be shown to the jury—but it was unknown at the time of trial that Mr. Bryson was present at the crime scene.

64.     With respect to the **fifth** fact, regarding the presence of Mr. Burrows' wallet on his body at the time police arrived, the evidence existed at the time of trial—it was known to Sergeant Brown (and, by extension, the prosecution team) from the moment police arrived and certainly prior to trial—but it was unknown by Mr. Braseel or his counsel because the State affirmatively represented the opposite through police reports and sworn testimony.

**B.     *The Proffered Evidence Is Admissible.***

65.     With respect to the **first** fact, regarding the presence of Mr. Bryson's fingerprints at the crime scene, this evidence is admissible. The latent fingerprint collected from the vehicle at the crime scene could be introduced into evidence through the officers present at the scene. The comparison print of Mr. Bryson could be introduced into evidence through government records. The resulting fingerprint match could be introduced through the State's fingerprint

19

examiner, who could render an admissible opinion that the prints match. Moreover, given the posture of the case, and the State's ethical obligations, much of this evidence could be subject to a stipulation and entered into evidence by agreement.

66.    With respect to the **<u>second</u>** fact, regarding the criminal history of Mr. Bryson and his violent tendencies, this evidence is admissible. The prior records of his convictions, including the judgments, could be introduced into evidence through the public records exception to the hearsay rule. Evidence of Mr. Bryson's violent tendencies, and his involvement in the murder of a police officer, could be introduced by eyewitnesses or through the records of the State (which could constitute admissions by party opponents). Nor would there be a bar to such evidence, as evidence suggesting Mr. Bryson was the person who killed Mr. Burrows would be admissible under *Holmes v. South Carolina*, 547 U.S. 319 (2006), and its progeny, which established a defendant's constitutional right to present a complete defense, including the right to introduce evidence suggesting an alternative perpetrator.

67.    With respect to the **<u>third</u>** fact, regarding the appearance of Mr. Bryson and how closely he resembles both the descriptions of the eyewitnesses and the appearance of Mr. Braseel, this evidence is admissible. The photographs of Mr. Bryson, including his driver's license photograph and mug shots, could be introduced as public records or by people who knew what he looked like at the time. Nor would there be a bar to such evidence, as evidence suggesting Mr. Bryson was the person who killed Mr. Burrows would be admissible under *Holmes v. South Carolina*, 547 U.S. 319 (2006), and its progeny, which established a defendant's constitutional right to present a complete defense, including the right to introduce evidence suggesting an alternative perpetrator.

68.    With respect to the **<u>fourth</u>** fact, regarding the vehicle that Mr. Bryson had access

to and its resemblance to both the descriptions of the eyewitnesses and the appearance of the vehicle driven by Mr. Braseel, this evidence is admissible. The public records demonstrating the car's ownership, make, model, and color could be introduced through the public records exception to the hearsay rule. The CarFax report indicating front end damage to the vehicle could be introduced through the business records exception to the hearsay rule. Evidence of the car's front end damage (including testimony and/or photographs) could also be introduced by witnesses who had first-hand knowledge of the car's condition at the time.

69.    With respect to the **fifth** fact, regarding the presence of Mr. Burrows' wallet on his body at the time police arrived, the evidence is admissible. Sergeant Brown can testify as a competent eyewitness about what he saw and experienced when he arrived at the crime scene.

   **C.    The Proffered Evidence Is Credible.**

70.    With respect to the **first** fact, regarding the presence of Mr. Bryson's fingerprints at the crime scene, this evidence is credible. There is no dispute that the latent fingerprint was collected from the victim's vehicle, and the evidence of the match with Mr. Bryson comes from the State's own crime lab.

71.    With respect to the **second** fact, regarding the criminal history of Mr. Bryson and his violent tendencies, this evidence is credible. His convictions are a matter of public record, and the State itself believes that Mr. Bryson killed a sheriff deputy and, later that day, himself.

72.    With respect to the **third** fact, regarding the appearance of Mr. Bryson and how closely he resembles both the descriptions of the eyewitnesses and the appearance of Mr. Braseel, this evidence is credible. There is no dispute about Mr. Bryon's appearance.

73.    With respect to the **fourth** fact, regarding the vehicle that Mr. Bryson had access to and its resemblance to both the descriptions of the eyewitnesses and the appearance of the

Case 4:17-cv-00027-CLC-SKL   Document 23-1   Filed 02/19/19   Page 21 of 60   PageID #: 118

vehicle driven by Mr. Braseel, this evidence is credible. The records and vehicle speak from themselves.

74. With respect to the **fifth** fact, regarding the presence of Mr. Burrows' wallet on his body at the time police arrived, the evidence is credible. Sergeant Brown has already sworn under oath that the information is true. He is an experienced law enforcement officer with no known adverse credibility determinations. And he has no known motive to lie.

## III. The Proffered Evidence Could Not Have Been Discovered Earlier.

75. As required by *Nunley*, this petition demonstrates "why the newly discovered evidence 'could not have been discovered in a more timely manner with the exercise of reasonable diligence . . . ." 552 S.W.3d at 816.

76. With respect to the **first** fact, regarding the presence of Mr. Bryson's fingerprints at the crime scene, this evidence could not have been discovered in a more timely manner with the exercise of reasonable diligence because it required access to the State's database of fingerprints. Neither Mr. Braseel nor his counsel could conduct fingerprint comparisons against the entire set of known prints, as the State was able to do here. Nor did Mr. Braseel and his counsel have access to the known fingerprints of Mr. Bryson. We similarly did not have any reason to know or suspect that Mr. Bryson was involved in the murder of Mr. Burrows.

77. These facts were first disclosed to counsel for Mr. Braseel in a letter from the State that was delivered in October 2018, more than fifteen (15) months after the fingerprints were matched to Mr. Bryson by the TBI. The State has not explained why it waited such a long period of time to disclose this incredibly exculpatory evidence to defense counsel.

78. With respect to the **second** fact, regarding the criminal history of Mr. Bryson and his violent tendencies, this evidence could not have been discovered in a more timely manner

with the exercise of reasonable diligence because Mr. Bryson only was identified as being connected to the murder of Mr. Burrows when the State disclosed the fingerprint report in October 2018. There was no reason that Mr. Braseel or his counsel would have known or suspected that he was connected to the murder of Mr. Burrows prior to that date. Nor was such knowledge reasonable; there are hundreds of individuals who have lived in Grundy County who have criminal records and violent tendencies. It would not be reasonable to expect defense counsel and the petitioner to independently assess whether each such individual may have had a connection to Mr. Burrows, or look like Mr. Braseel.

79. With respect to the **third** fact, regarding the appearance of Mr. Bryson and how closely he resembles both the descriptions of the eyewitnesses and the appearance of Mr. Braseel, this evidence could not have been discovered in a more timely manner with the exercise of reasonable diligence for the same reasons as the second fact discussed in the paragraph above.

80. With respect to the **fourth** fact, regarding the vehicle that Mr. Bryson had access to and its resemblance to both the descriptions of the eyewitnesses and the appearance of the vehicle driven by Mr. Braseel, this evidence could not have been discovered in a more timely manner with the exercise of reasonable diligence for the same reasons as the second and third facts discussed in the paragraphs above.

81. In addition, although the State knew the name of Mr. Bryson's girlfriend at the time it sent its October 2018 letter, it did not provide this name to defense counsel. Instead, defense counsel had to conduct its own investigation to determine the name of the girlfriend, locate any vehicles she owned or used, and gather information about these vehicles. Defense counsel conducted this investigation from the time it received the State's letter until the very day this petition was filed, working as expeditiously as possible.

82.     With respect to the **fifth** fact, regarding the presence of Mr. Burrows' wallet on his body at the time police arrived, this evidence could not have been discovered in a more timely manner with the exercise of reasonable diligence because the State affirmatively misled defense counsel about Sergeant Brown's involvement in the investigation and presented perjured testimony to the opposite—that the wallet was *not* present when the body of Mr. Burrows was discovered. In addition, it took extensive time for petitioner's investigators to determine that the State may have presented false testimony on this issue, and additional time to locate Sergeant Brown and convince him to provide the information he knew about the case.

83.     In addition, trial counsel for Mr. Braseel, Floyd Davis and Robert Peters, conducted their own investigation of the facts prior to trial, acted reasonably when doing so, and had no pretrial knowledge of the newly discovered evidence.

84.     All of the facts presented above about the petitioner's exercise of reasonable diligence, and that of his counsel, in uncovering and presenting these newly discovered facts are supported by the Affidavit of counsel Alex Little, which is attached as Exhibit 1 to this petition.

## IV.     The Proffered Evidence Would Have Resulted In A Different Judgment.

85.     The newly discovered evidence destroys the thin filaments of the case the State presented against Mr. Braseel at trial. As noted above, the State's theory that Mr. Braseel was the murderer depended on (i) the identification of him by two strangers, and (ii) identification of the vehicle he was driving by the same witnesses. There was no physical evidence connecting Mr. Braseel to the crime, and the only motive offered was that Mr. Braseel killed Mr. Burrows in the course of a robbery gone bad.

86.     The **first three** facts supported by the new evidence call into question whether the identification of Mr. Braseel by Ms. Hill and Mr. Braden was correct. Had the jury heard that the

fingerprints of Mr. Bryson were found in the passenger side of the vehicle Mr. Burrows was driving moments before his death, and had the jury seen the striking resemblance of Mr. Bryson to the descriptions provided by the eyewitnesses, they would not have found the necessary element of identification beyond reasonable doubt.

87. On this point, Mr. Bryson was a violent felon at the time of Mr. Burrows' murder. He had recently been released from prison, and he was linked to the victim through his girlfriend's child. In contrast, Mr. Braseel had no criminal history or similar relational link to the victim.

88. Even more notably, Mr. Bryson bore a striking resemblance to Mr. Braseel in weight, skin tone, hair color, and eye color. But for the suggestive photo array, the witnesses likely would not have identified Mr. Braseel as the perpetrator, and they even may have identified Mr. Bryson had his photograph been tested. Even if the witnesses continued to identify Mr. Braseel as the perpetrator at trial, the credibility of those identifications would have been destroyed in light of Mr. Bryson's link to the murder scene and victim's family.

89. Similarly, the **fourth** fact supported by the new evidence calls into question whether the identification of the vehicle linked to Mr. Braseel by the trial witnesses was correct. Had the jury heard that the fingerprints of Mr. Bryson were found in the passenger side of the vehicle Mr. Burrows was driving moments before his death, and had the jury seen the striking resemblance of his girlfriend's vehicle (which he regularly had access to) to the descriptions provided by the eyewitnesses of the vehicle driven by the perpetrator, they would not have found the necessary element of identification beyond reasonable doubt.

90. Moreover, the **fifth** fact supported by the new evidence directly and completely undermines the State's theory of motive—that this was a botched robbery. Sergeant Brown's

testimony establishes that Mr. Burrows' wallet remained on him after the murder. There is thus no evidence that he was robbed. Given the State's burden of proof, the lack of motive alone would have resulted in a different judgment.

91. Taken together, if all of this evidence had been known and introduced at trial, there is simply no question that the jury verdict would have been different. "The goal of the relief afforded under a writ of error *coram nobis* is a reliable determination of the petitioner's criminal liability for the offense with which he was charged based on *all of the evidence* that should have been made available to the fact-finder at the initial trial." *Payne v. State*, 493 S.W.3d 478, 485 (Tenn. 2016). Here, in the absence of the newly discovered evidence, the jury's determination that Mr. Braseel was criminally responsible is not reliable.

## V.   The Petition Is Timely Filed and Entitled to Equitable Tolling.

92. This petition is timely filed because it is filed within the time period for which the applicable statute of limitations has been equitably tolled.

93. The relevant statute of limitations is detailed in Tenn. Code Ann. § 27-7-103. Pursuant to that statue, a writ of error *coram nobis* must be filed within one year after the judgment becomes final. Here, the judgment became final on or about February 17, 2011, which is when Mr. Braseel's petition for appeal to the Tennessee Supreme Court was denied, or ninety days thereafter, when his time to file a writ of certiorari to the U.S. Supreme Court expired.

94. In either scenario, the filing of this petition comes more than a year later. This filing is nonetheless permissible and timely because Mr. Braseel is entitled to equitable tolling of the filing deadline. He is entitled to such relief for at least two reasons.

95. *First*, this is a claim of actual innocence that is based on evidence that Mr. Braseel or his counsel did not know—and could not know—until only weeks prior to the filing of the

petition. Strict application of the statute of limitations in such circumstances would violate Mr. Braseel's due process rights, as contemplated by *Dellinger v. State*, 279 S.W.3d 282 (Tenn. 2009).

96.    *Second*, the grounds upon which this petition is based are "later arising" grounds, as contemplated by *Nunley*, 552 S.W.3d 829. That is, as demonstrated above, the newly discovered evidence was only recently uncovered and arose after the point in time when the applicable statute of limitations statute of limitations normally would have started to run. Based on the facts of the case, as detailed above, the strict application of the statute of limitations would effectively deny Mr. Braseel a reasonable opportunity to present his claims.

97.    In addition, Mr. Braseel is entitled to equitable tolling because he presents patently meritorious grounds for relief.

## **PRAYER FOR RELIEF**

98.    For the foregoing claims enumerated herein, and for the reasons detailed in this Petition and its Exhibits, Adam Braseel prays this Honorable Court to:

a)  Order the State to file an Answer to this Petition;

b)  Allow Petitioner to further Amend the petition, if appropriate;

c)  After permitting a reasonable time for discovery, this Court hold an evidentiary hearing on all procedural and substantive matters as to which there are factual disputes;

d)  Grant Adam Braseel an unconditional writ of error *coram nobis*;

e)  Grant Adam Braseel a conditional writ of *coram nobis;* and

f)  Grant any other relief the Court deems necessary and appropriate.

27

Respectfully submitted,

**BONE McALLESTER NORTON PLLC**

J. Alex Little (#029858)
Zachary Lawson (#036092)
511 Union Street, Suite 1600
Nashville, TN 37219
(615) 238-6300 (phone)
(615) 238-6301 (fax)
alex.little@bonelaw.com

*Counsel for Petitioner*

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2019, a true and correct copy of the foregoing document has been served via U.S. Mail, postage prepaid, upon the following:
FedEx

J. Michael Taylor, Esq.
Steve Strain, Esq.
District Attorney General
12th Judicial District
375 Church Street, Suite 300
Dayton, Tennessee 37321

# EXHIBITS

# IN THE CIRCUIT COURT FOR GRUNDY COUNTY, TENNESSEE
## AT ALTAMONT

|  |  |  |
|---|---|---|
| ADAM BRASEEL, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 4221 |
| | ) | |
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

---

## AFFIDAVIT OF J. ALEX LITTLE

---

I, J. Alex Little, being duly sworn, state the following based on my personal knowledge:

1.    I am an adult over the age of 18 years old. I am competent to testify to the following facts.

2.    I am a partner at Bone McAllester Norton, PLLC, and I represent Mr. Adam Braseel in his Petitions for Post-Conviction Relief and for a Writ of Error *Coram Nobis*.

3.    In 2014, investigative journalist David Sale began investigating this case. In February of 2015, Sergeant Mike Brown reached out to Mr. Sale on Facebook wanting to provide information about the case. *See* Exhibit 3, Affidavit of David Sale.

4.    Sergeant Brown had retired from the Grundy County Sheriff's Department and left the state. After more than a year of trying to make further contact with Sergeant Brown, Mr. Sale spoke with Sergeant Brown. *See* Exhibit 3.

**EXHIBIT**

**1**

5.    After Sergeant Brown spoke with Mr. Sale, Sergeant Brown prepared and signed a sworn affidavit recounting what he saw at the crime scene. It is attached as Exhibit 2 to this petition.

6.    More new evidence followed. This time from the State. In the initial investigation, the Tennessee Bureau of Investigations Nashville Crime Laboratory (hereinafter "TBI Lab") examined latent fingerprints from the scene of the murder of Malcolm F. Burrows on January 7, 2006. *See* Exhibit 5, Official Latent Print Report.

7.    TBI Lab issued its first latent fingerprint report on July 31, 2006. *See* Exhibit 5.

8.    Unbeknownst to Mr. Braseel or his counsel, the TBI Lab reexamined latent fingerprints and issued a second report on June 29, 2017. *See* Exhibit 5.

9.    The State of Tennessee, through Assistant District Attorney General Steve Strain, provided me with the results of the second latent fingerprint report by letter dated October 3, 2018, which was sent to me via U.S. Mail, over 15 months following issuance of this report. *See* Exhibits 4-5, Letter of ADA Steve Strain and Official Latent Print Report.

10.    I did not receive Mr. Strain's mailed letter until at least October 10, 2018.

11.    The TBI Lab's second report identifies matched prints from Andrew West (one of the responding officers) and Kermit Bryson (now deceased). *See* Exhibit 5.

12.    The report shows that Kermit Bryson's print matched the one found on the interior passenger door handle of the victim's car. *See* Exhibit 5.

13.    According to the State's letter, Bryson had an extensive criminal history at the time of Malcolm Burrow's murder. He was convicted and incarcerated for

2

Aggravated Burglary, Burglary, Theft, and Escape. Bryson was paroled in September 2003 and released from parole in May, 2005. *See* Exhibit 4.

14. The letter also stated that Bryson is alleged to have killed a deputy sheriff in 2008 and that Bryson killed himself later that same day. *See* Exhibit 4.

15. With this information, my law partners, paralegals, and I (hereinafter "Mr. Braseel's legal team") were able to find numerous online news stories covering the manhunt for Bryson for murdering the deputy sheriff. These news stories shared pictures of Bryson, including pictures taken by the state agencies such as the one in Exhibit 6.

16. Kermit Bryson bears an uncanny resemblance to Mr. Braseel in body type, hair color, skin color, and eye color. *See* Exhibit 6.

17. According to the State's letter, Bryson was not incarcerated at the time of Malcolm Burrows' murder on January 7, 2006. *See* Exhibit 4.

18. According to the State's letter, Bryson has at least one known connection to Malcolm Burrows. Bryson's girlfriend was raising a child whom Malcolm Burrows considered to be his grandchild. *See* Exhibit 4.

19. In addition, the State's letter indicated that, while Bryson did not own a motor vehicle, he was known to "get a ride with his girlfriend." The State did not disclose the name of Bryson's girlfriend despite admitting that the State recently interviewed her. *See* Exhibit 4.

20. In February 2019, Mr. Braseel's legal team was able to confirm that a woman named Tina Bretz was Bryson's girlfriend by finding matching residential addresses found in a public records database and viewing the public Facebook accounts of Tina Bretz and Christa Bryson, the daughter of Bryson and Ms. Bretz.

3

21.     In February 2019, Mr. Braseel's legal team accessed public records from the Tennessee Department of Safety, Title & Registration Division that show that at the time of Malcolm Burrows murder, Ms. Bretz owned a beige 1998 Ford Escort. *See* Exhibit 7. A photo of a car matching the make, model, year, and color of Ms. Bretz's car was found via internet research by Mr. Braseel's legal team is attached as Exhibit 8.

22.     The public records also listed the VIN number of Ms. Bretz's beige 1998 Ford Escort. In February 2019, Mr. Braseel's legal team ran a CarFax inquiry on Ms. Bretz's car based on that VIN number. In response, CarFax reported that in 2000, the front right end of the car was damaged in a collision. *See* Ex. 9, CarFax Report. There is no indication the damage was fixed prior to the murder of Malcolm Burrows. *See id.*

23.     The petition details five newly discovered facts. With respect to the **first** fact, regarding the presence of Mr. Bryson's fingerprints at the crime scene, this evidence could not have been discovered in a more timely manner with the exercise of reasonable diligence because it required access to the State's database of fingerprints. Neither Mr. Braseel nor his counsel could conduct fingerprint comparisons against the entire set of known prints, as the State was able to do here. Nor did Mr. Braseel and his counsel have access to the known fingerprints of Mr. Bryson. We similarly did not have any reason to know or suspect that Mr. Bryson was involved in the murder of Mr. Burrows.

24.     These facts were first disclosed to counsel for Mr. Braseel in a letter from the State that was delivered in October 2018, more than fifteen (15) months after the fingerprints were matched to Mr. Bryson by the TBI. The State has not explained why it waited such a long period of time to disclose this incredibly exculpatory evidence to defense counsel.

4

25.     With respect to the **second** fact, regarding the criminal history of Mr. Bryson and his violent tendencies, this evidence could not have been discovered in a more timely manner with the exercise of reasonable diligence because Mr. Bryson only was identified as being connected to the murder of Mr. Burrows when the State disclosed the fingerprint report in October 2018. There was no reason that Mr. Braseel or his counsel would have known or suspected that he was connected to the murder of Mr. Burrows prior to that date. Nor was such knowledge reasonable; there are hundreds of individuals who have lived in Grundy County who have criminal records and violent tendencies. It would not be reasonable to expect defense counsel and the petitioner to independently assess whether each such individual may have had a connection to Mr. Burrows, or look like Mr. Braseel.

26.     With respect to the **third** fact, regarding the appearance of Mr. Bryson and how closely he resembles both the descriptions of the eyewitnesses and the appearance of Mr. Braseel, this evidence could not have been discovered in a more timely manner with the exercise of reasonable diligence for the same reasons as the second fact discussed in the paragraph above.

27.     With respect to the **fourth** fact, regarding the vehicle that Mr. Bryson had access to and its resemblance to both the descriptions of the eyewitnesses and the appearance of the vehicle driven by Mr. Braseel, this evidence could not have been discovered in a more timely manner with the exercise of reasonable diligence for the same reasons as the second and third facts discussed in the paragraphs above.

28.     In addition, although the State knew the name of Mr. Bryson's girlfriend at the time it sent its October 2018 letter, it did not provide this name to me. Instead, Mr.

Braseel's legal team had to conduct its own investigation to determine the name of the girlfriend, locate any vehicles she owned or used, and gather information about these vehicles. We conducted this investigation from the time I received the State's letter until the very day this petition was filed, working as expeditiously as possible.

29.     With respect to the **fifth** fact, regarding the presence of Mr. Burrows' wallet on his body at the time police arrived, this evidence could not have been discovered in a more timely manner with the exercise of reasonable diligence because the State affirmatively misled defense counsel about Sergeant Brown's involvement in the investigation and presented perjured testimony to the opposite—that the wallet was *not* present when the body of Mr. Burrows was discovered. In addition, it took extensive time for petitioner's investigators to determine that the State may have presented false testimony on this issue, and additional time to locate Sergeant Brown and convince him to provide the information he knew about the case.

30.     In addition, I spoke with trial counsel for Mr. Braseel, Floyd Davis and Robert Peters, about these matters. In these conversations, I confirmed that they conducted their own investigation of the facts prior to trial, acted reasonably when doing so, and had no pretrial knowledge of the newly discovered evidence.

Signature on following page

6

_____

**J. ALEX LITTLE**
Bone McAllester Norton, PLLC
Nashville City Center
511 Union Street, Suite 1600
Nashville, Tennessee 37219
Phone: (615) 238-6301


Sworn and subscribed before me on this 8ᵗʰ day of February, 2019


_____
Notary Public

My Commission expires: **09/07/2021**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| ADAM BRASEEL, | ) | |
| | ) | |
| *Petitioner,* | ) | |
| | ) | |
| v. | ) | No. _____ |
| | ) | |
| ⚫DARREN SETTLES, Warden | ) | |
| **Bledsoe County Correctional Complex,** | ) | |
| | ) | |
| *Respondent.* | ) | |
| | ) | |

---

## DECLARATION OF MICHAEL JOHN BROWN

---

I, Michael John Brown, declare and state as follows from my own personal knowledge:

1.  I currently reside in St. Augustine, Florida, and I am retired from the U.S. Army.

2.  In 2006, I was employed as a night patrol sergeant with the Grundy County Sheriff's Department and I participated in the investigation of the murder of Malcolm Burrows and the assaults of Rebecca Hill and Kirk Braden.

3.  On January 7, 2006, I responded to a call to a home on Melissa Rock Road. When I arrived at the house, I spoke with Rebecca "Becky" Hill and Kirk Braden, who

EXHIBIT

2

tabbies'

reported that they had been assaulted prior to my arrival. I stayed at the home for a while speaking with Ms. Hill and Mr. Braden.

4.      Once the ambulance arrived, I left the home and stopped by the vehicle that Malcolm Burrows had reportedly taken which was stopped up the road. I walked up a trail next to the car and discovered the body of Malcolm Burrows.

5.      I do not recall taking any witness statements in the course of my investigation of Malcolm Burrows' death.

6.      When I discovered the body, Mr. Burrows was fully clothed. His hooded sweatshirt was pulled up above the waistline of his pants. I observed that Mr. Burrows' wallet was in his back pocket at that time.

7.      I did not remove the wallet or otherwise move the body. I walked back to my car and called my partner Billy Scissom to return to the scene.

8.      When my partner arrived, I showed him what I had found. I then called dispatch to report that I had found a corpse and that it was a possible homicide.

9.      Sheriff Brent Myers and TBI Agent Larry Davis arrived at the scene sometime later, and I showed them the body and the crime scene. I then left the scene. Sheriff Myers and Agent Davis remained at the scene.

10.      Several years later, I discovered that the case was proceeding to trial. I contacted the District Attorney's office about testifying at Adam Braseel's trial. They responded that they did not need me to testify because they had it covered.

2

11.     When I later found out that Kirk Braden was arrested for beating his mother, that witness statements falsely bore my name, and that false statements were made in the course of the trial that Mr. Burrows' wallet was stolen, I decided to come forward and provide the information that I have.

I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 19, 2017.

MICHAEL JOHN BROWN

3

# IN THE CIRCUIT COURT FOR GRUNDY COUNTY, TENNESSEE
## AT ALTAMONT

| | | |
|---|---|---|
| ADAM BRASEEL, | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 4221 |
| | ) | (POST-CONVICTION) |
| STATE OF TENNESSEE, | ) | |
| | ) | TRIAL COURT NO.: 4221 |
| Respondent. | ) | |
| | ) | |

---

## AFFIDAVIT OF DAVID K. SALE

---

I, David K. Sale, being over 18 years of age and competent to testify based on personal knowledge, do hereby swear that the following facts are true:

1.  I reside at 18 Stewart Avenue, Ithaca, New York, and am the owner of At Risk Films, LLC.

2.  I have significant experience in investigative film work, and prior to my involvement with the Adam Braseel case, I was involved with the exoneration of a man in Saint Louis, Missouri.

3.  In late 2014, I took an interest in the Adam Braseel case ("Braseel case") when conducting research for a potential film about the effect of opioid profiteering on the legal system.

4.  In the course of my research, I learned that former alderman Malcolm Burrows ("Burrows") was found murdered.

EXHIBIT

3

5.    My review of discovery documents in the Braseel case revealed that, at the time of Burrows's death, Burrows and some local doctors were under investigation by the Drug Enforcement Administration ("DEA") and Tennessee Bureau of Investigation ("TBI") regarding the illegal distribution of prescription drugs.

6.    I found that Burrows's activities in narcotics were well-publicized in the local paper prior to his death, and yet these activities were not brought out in court proceedings or press coverage during the course of Adam Braseel's conviction.

7.    I therefore continued my research, launching a Facebook page and blog to publicize developments in my research and the Braseel case.

8.    In the course of what turned out to be a difficult two-year search, with many people I contacted being afraid to talk to me, I looked for and eventually found former Grundy County Sheriff investigator Sergeant Mike Brown ("Sergeant Brown"), who responded to the crime scene for the Sheriff's Office after Tracy City Police had arrived.

9.    In retrospect, the need to locate Sergeant Brown was not immediately apparent. I discovered through the course of my research that Sergeant Brown's role was hidden by errors in records, lost or destroyed files, and the perjured testimony of Agent Larry Davis ("Agent Davis").

10.   For example, the appellate record stated that Sergeant Troy Brown had found Burrows's body. Although Sergeant Troy Brown testified at trial, he was not at the crime scene; therefore, I came to realize that a different Sergeant Brown was at the scene.

11.   I looked for a report from Sergeant Mike Brown but found none.

2

12.     In addition, Agent Davis testified that he was the one who discovered weapons in the Burrows house, despite having arrived long after other officers, including Sergeant Brown.

13.     These discrepancies in the record ultimately led me to the conclusion that I needed to find Sergeant Brown. Sergeant Brown was not an easy man to locate.

14.     At first, I could only find that Sergeant Brown had a wife that was very sick at the time of Adam Braseel's arrest in early 2006 and that she later passed. I learned that Sergeant Brown then retired and left the state.

15.     It is my opinion that there was a definite climate of fear surrounding the Burrows murder. No one I talked with knew where Segreant Brown went, and if they did, they would not say.

16.     For instance, a woman whom I interviewed early in my research and who was eager to help had died of a stroke. The mother of another woman I interviewed called and told me never talk to her daughter again because she was afraid for the lives of her grandchildren. Even Grundy County Sheriff Clint Shrum showed trepidation when responding to my inquiry.

17.     The first time I heard from Sergeant Brown was on February 3, 2015, when he sent me an unprompted message on Facebook.

18.     The message read: "I am the one who found Malcom Burrows [sic] body the night of the murder. I have ALL the information! I took the picture of the broken baseball bat......A local doctors [sic] prize [sic] horses were killed and Malcom paid the price for it. [The doctor] supplied him with pills!" His Facebook page indicated that he was residing in Arizona at the time, which I found was not true.

3

19.     I did not get additional messages from Sergeant Brown for more than a year. I assumed that, based on my failed attempts to question others, Sergeant Brown was reluctant to speak out due to fear of retribution.

20.     I finally spoke to Sergeant Brown on or about October 14, 2016. It was the first time I had talked to him other than the first note I had received. It was then that I learned that there were many differences in his recollection of events, including that when he discovered Burrows's body, he saw a wallet in his back pocket. I taped the interview.

21.     Based on my knowledge and experience, it would have extremely difficult for the defense to know that they should talk to Sergeant Brown unless they knew the police were withholding evidence. And even then, it would have been difficult for the defense to locate and interview him.

4

FURTHER AFFIANT SAITH NOT.

_____
DAVID K. SALE

Sworn and subscribed before me on this 24 day of July, 2018

_____
Notary Public

My Commission expires: 3|20|2021

AMANDA J. CATONE
Notary Public, State of New York
Registration no. 01CA6355980
Qualified in Tompkins County
Commission Expires March 20, 20 21

5

# State of Tennessee



## DISTRICT ATTORNEY GENERAL
### 12th Judicial District
### MIKE TAYLOR

**ASSISTANT
DISTRICT ATTORNEYS**
Will Dunn
Steven M. Blount
Steven H. Strain
James W. Pope, III
Sherry D. Shelton
Julia N. Veal
David O. McGovern
David L. Shinn, Jr.
Courtney C. Lynch

**CRIMINAL INVESTIGATORS**
Allan D. Weeks
Larry B. Davis

**ADMINISTRATIVE ASSISTANT**
Allyson N. Walker

**VICTIM/WITNESS
COORDINATOR**
Cara Quintero
Jenny Armstrong

**SECRETARIES**
Lynne Curtis
Debbie Morton
Lynne Shadden

October 3, 2018

Mr. J. Alex Little
Attorney at Law
511 Union Street, Suite 1600
Nashville, TN 37219

     RE:  Braseel v State of Tennessee, # 4221 Grundy Circuit

Dear Alex,

I have enclosed two latent print reports from the TBI lab.  The first report was from July 2006 and it reported several prints from the Chrysler Fifth Avenue vehicle.  That is the vehicle which was found at the scene where the body of the victim was located.  Subsequently the lab matched two prints to Andrew West, who was one of the responding officers and Kermit Bryson.  Mr. Bryson is now deceased.

Mr. Bryson is alleged to have killed a deputy sheriff, Anthony Tate in June 2008.  The deputy was attempting to serve a Community Corrections violation warrant at the time of his death.  Mr. Bryson committed suicide later that day and thus was never interviewed regarding the circumstances.

His name has never come up regarding the homicide of Malcolm Burrows.  While we have long suspected Mr. Braseel had assistance in committing the murder, Mr. Bryson's name has never been mentioned.  As part of the post conviction proceedings Mr. Trant engaged the services of a private detective who advanced several theories regarding the case, but again, Mr. Bryson was never mentioned.  Nor does he match the description given at the scene prior to Mr. Braseel being a suspect.

I would like to give you a little background on the case.  I don't believe these are matters which those on the side of Mr. Braseel make reference to.  We had two theories as to why Mr. Burrows was killed.  We had heard Krista Garner owed him a substantial amount of money and she had him killed.  One of the rumors we heard was that Mr. Burrows had killed one of her horses.  We were never able to verify that she had had a horse killed.  Nor were we able to link her to the homicide.

**REPLY TO:**

Rhea County ☐
Courthouse Annex
375 Church Street
Suite 300
Dayton, Tennessee 37321-1238
(423) 775-4468
Fax: (423) 775-2805

3751 Main Street ☑
P. O. Box 1058
Jasper, Tennessee 37347-0130
(423) 942-5289
Fax: (423) 942-5670

District Attorney General ☐
1002 West Main Street
Decherd, Tennessee 37324
(931) 962-1144
Fax: (931) 962-1165

1

**EXHIBIT
4**


**Counties**
Bledsoe ● Franklin
Grundy ● Marion
Rhea ● Sequatchie

**ASSISTANT**
**DISTRICT ATTORNEYS**
Will Dunn
Steven M. Blount
Steven H. Strain
James W. Pope, III
Sherry D. Shelton
Julia N. Veal
David O. McGovern
David L. Shinn, Jr.
Courtney C. Lynch

**CRIMINAL INVESTIGATORS**
Allan D. Weeks
Larry B. Davis

**ADMINISTRATIVE ASSISTANT**
Allyson N. Walker

**VICTIM/WITNESS**
**COORDINATOR**
Cara Quintero
Jenny Armstrong

**SECRETARIES**
Lynne Curtis
Debbie Morton
Lynne Shadden

**REPLY TO:**

Rhea County         ☐
Courthouse Annex
375 Church Street
Suite 300
Dayton, Tennessee 37321-1238
(423) 775-4468
Fax: (423) 775-2805

3751 Main Street    ☐
P. O. Box 1058
Jasper, Tennessee 37347-0130
(423) 942-5289
Fax: (423) 942-5670

District Attorney General  ☐
1002 West Main Street
Decherd, Tennessee 37324
(931) 962-1144
Fax: (931) 962-1165

The other theory we had was that Mr. Burrows had started the fire which destroyed the home of Mr. Braseel's mother, Imogene. The fire was ruled to be arson and we had information that Mr. Burrows had set the fire, at the request of Imogene. She was to pay Mr. Burrows $1500 for starting the fire. Within a week or so of the arson fire the cabin your client lived in, which was located on the same property as his mother's home, also burned as the result of arson. This apparently made the insurance company suspicious and thus Imogene was unable to pay Mr. Burrows. We suspect Mr. Burrows may have threatened her and thus the homicide occurred.

These were not matters which we were able to prove; other than the cause and origin of the fires. However, we were aware of a relationship between Mr. Burrows and the Braseel family.

Prior to trial we discussed both these theories with defense counsel and were interested as to the name of any third party who might have participated in the homicide. Again, Mr. Bryson never came up in any of these discussions.

In the time since the trial wild allegations have been advanced, such as this was a conspiracy by "Big Pharma" to kill Mr. Burrows and other such assertions without any basis in reality.

We had two days set aside for the post conviction hearing. Mr. Trant put no proof on regarding the identification issue in spite of having subpoenaed everyone involved in the case. His only proof went to the alibi issue and it was not compelling. We have never understood why he was so brief.

The possibility of Mr. Bryson being involved in the homicide is a matter we have looked at in great detail. I received the file several months ago and asked for some follow up. I felt it was important to complete the investigation so it would not be tainted by the bizarre theories on social media.

Mr. Bryson did have a criminal history. He had been convicted of Aggravated Burglary, Burglary, Theft and Escape and sent to prison. He was paroled in September 2003 and released from parole in May, 2005.

The homicide occurred on January 7, 2006. The first call came in after nine PM.

2

**Counties**
Bledsoe ● Franklin
Grundy ● Marion
Rhea ● Sequatchie



# State of Tennessee

## DISTRICT ATTORNEY GENERAL
### 12th Judicial District
### MIKE TAYLOR

**ASSISTANT
DISTRICT ATTORNEYS**
Will Dunn
Steven M. Blount
Steven H. Strain
James W. Pope, III
Sherry D. Shelton
Julia N. Veal
David O. McGovern
David L. Shinn, Jr.
Courtney C. Lynch

**CRIMINAL INVESTIGATORS**
Allan D. Weeks
Larry B. Davis

**ADMINISTRATIVE ASSISTANT**
Allyson N. Walker

**VICTIM/WITNESS
COORDINATOR**
Cara Quintero
Jenny Armstrong

**SECRETARIES**
Lynne Curtis
Debbie Morton
Lynne Shadden

**REPLY TO:**

Rhea County                    ☐
Courthouse Annex
375 Church Street
Suite 300
Dayton, Tennessee 37321-1238
(423) 775-4468
Fax: (423) 775-2805

3751 Main Street               ☐
P. O. Box 1058
Jasper, Tennessee 37347-0130
(423) 942-5289
Fax: (423) 942-5670

District Attorney General      ☐
1002 West Main Street
Decherd, Tennessee 37324
(931) 962-1144
Fax: (931) 982-1165

Subsequently he was arrested on September 27, 2006 by the chief of police for Monteagle and charged with Felony Possession of Marijuana. He pled guilty to the charge in Circuit Court on May 16, 2007 and was sentenced to two years Community Corrections and had five weekends to serve which were served during the week. A violation order was entered on August 13, 2007 for time served for failing to abide by house arrest. He served twenty four days. On December 10, 2007 he was again violated for curfew violations and give ninety days. He had credit back to October 15, 2007.

Mr. Bryson did not own a motor vehicle and was known to hitchhike or get a ride with his girlfriend or her brother. We know of no connection between Mr. Bryson and either Malcolm Burrows or Adam Braseel. Nor are we aware of any connection with Becky Hill. Mr. Bryson's girlfriend was raising a child whom Mr. Burrows considered to be his grandchild. She is not aware of any interaction between the two men.

In addition, in a subsequent interview with Mr. Bryon's girlfriend she advises her birthday is January 5. In 2006 that was on a Thursday and they had a birthday celebration that Saturday night, which was the night of the homicide. She states she and Mr. Bryson were living together and he was at the birthday party. She was not on Face Book at the time but she believes she has some photographs from the party.

Sincerely,

Steven H. Strain

enclosures

3




**TENNESSEE BUREAU OF INVESTIGATION**
NASHVILLE CRIME LABORATORY
901 R.S. Gass Boulevard
Nashville, Tennessee 37216-2639

**BILL HASLAM**
Governor

**MARK GWYN**
Director

## OFFICIAL LATENT PRINT REPORT

TO: Brad Nealon
TBI - East CID
AGENCY CASE NO:   CH5A000094

DATE ISSUED:   6/29/17
LAB CASE NO:   061000289
COUNTY:   Grundy

SUBJECT(S):
ADAM CLYDE BRASEEL

VICTIM(S):
MALCOLM F. BURROWS
REBECCA B. HILL

Received From:  Larry Davis
Received By:   S. Lafferty
EXHIBIT(S):
13-a            Cans from kitchen floor of Malcolm Burrows' residence

Date Received:  1/26/06
Time Received:  4:05 pm

Received From:  Larry Davis
Received By:   S. Lafferty
EXHIBIT(S):
04-a            Sundrop bottle near crime scene
15              Chrysler Fifth Avenue (VIN # IC3BF66PXGX508545)

Date Received:  1/26/06
Time Received:  4:05 pm

Received From:  Larry Davis
Received By:   Lindsay Baker
EXHIBIT(S):
04-a            Sundrop bottle near crime scene
13-a            Cans from kitchen floor of Malcolm Burrows' residence

Date Received:  7/30/15
Time Received:  11:40 am

Received From:  TBI ISD
Received By:   J. Reid, CLPE
EXHIBIT(S):
35              Known finger impressions of Andrew Martin West

Date Received:  6/28/17
Time Received:  10:55 am

Received From:  TBI ISD
Received By:   J. Reid, CLPE
EXHIBIT(S):
36              Known finger impressions of Kermit Eugene Bryson

Date Received:  6/28/17
Time Received:  10:58 am

RESULTS:

Refer to the TBI Official Latent Print Report dated 07/31/06 for previous results.

AFIS:

The latent prints (L-1, L-3) were resubmitted for search against the State of Tennessee's Automated Fingerprint Identification System (AFIS) database. The searches resulted in identifications.

The previously developed latent prints from exhibits 04-a (Sundrop bottle), 13-a (starch can), and 15 (Chrysler Fifth Avenue) were compared to the known impressions of Andrew Martin West (D.O.B. 12/15/69, SID No. 001215761) and Kermit Eugene Bryson (D.O.B. 11/05/78, SID No. 000781267) with the following results:

L-1:  Identified to the left index (#7) finger of Andrew Martin West



Page 1

EXHIBIT
**5**

## OFFICIAL LATENT PRINT REPORT

**LABORATORY CASE NO:**      061000289

**DATE ISSUED:**      6/29/17

(latent print developed on Sundrop bottle)
L-2: Inconclusive to all above named individuals
L-3: Identified to the right index (#2) finger of Kermit Eugene Bryson
(latent print developed on Chrysler Fifth Avenue passenger door handle (interior))

Clearer and more fully rolled known impressions including joint areas of Andrew Martin West and Kermit Eugene Bryson are needed for a complete comparison to L-2.

The latent print (L-2) was not applicable for entry into the State of Tennessee's Automated Fingerprint Identification System (AFIS) and the Federal Bureau of Investigation's Next Generation Identification (NGI) System databases.

In conclusion, one (1) identifiable latent joint area remains unidentified.

DISPOSITION:

Exhibits 35, 36, and the developed latent prints will remain on file.

Respectfully Submitted,

*J. E. Reid*

J. E. Reid, CLPE
Special Agent / Forensic Scientist
The above represents the interpretations and opinions of the analyst.
Technical notes and data supporting the conclusions/findings in this report are maintained within the laboratory case records.



Page 2 of 2



**State of Tennessee**
# TENNESSEE BUREAU OF INVESTIGATION

**NASHVILLE CRIME LABORATORY**
901 R.S. Gass Boulevard
Nashville, Tennessee 37216-2639
(615) 744-4000
Facsimile (615) 744-4668
TDD (615) 744-4001

**PHIL BREDESEN**
Governor



**MARK GWYN**
Director

## OFFICIAL LATENT PRINT REPORT

**TO:** Larry Davis
T.B.I.-Chattanooga Office
State Office Building, Suite 650
540 McCallie Avenue
Chattanooga, TN 37402

**DATE ISSUED:** 7/31/06
**LAB CASE NO:** 061000289
**COUNTY:** Grundy
**AGENCY CASE NO:** CH5A000094

**SUBJECT(S):**
ADAM CLYDE BRASEEL

**VICTIM(S):**
MALCOLM F. BURROWS
REBECCA B. HILL

Received From: Davis, Larry
Received By: Lafferty, Suzann
Date Received: 1/26/06
Time Received: 4:05 pm

**EXHIBIT(S):**

| | |
|---|---|
| 02-a | Jump starter located near victim's body |
| 03-a | Plastic pill bottle from road near victim's residence |
| 04-a | Sundrop bottle located on road near victim's residence |
| 05-a | Cigarette butts from victim's residence |
| 06-a | Glass bottle from Melissa Rock Rd. |
| 07-a | Cup near Malcolm Burrows' body |
| 08-a | Cup from victim's residence |
| 09-a | Glass bottle near Malcolm Burrows' body |
| 10-a | Fire extinguisher from victim's residence |
| 11-a | Ball bat from victim's residence |
| 12-a | Pepsi bottle from victim's residence |
| 13-a | Cans from front kitchen area of victim's residence |
| 14-a | Trash from living room of victim's residence |
| 15 | Chrysler Fifth Avenue (VIN # IC3BF66PXGX508545) |

Received From: Davis, Larry
Received By: Lafferty, Suzann
Date Received: 2/24/06
Time Received: 12:30 pm

**EXHIBIT(S):**

| | |
|---|---|
| 28-a | Known finger and palm impressions from Adam Clyde Braseel |



INTERNATIONALLY ACCREDITED SINCE 1994

Case 4:17-cv-00027-CLC-SKL   Document 23-1   Filed 02/19/19   Page 50 of 60   PageID #: 147

# OFFICIAL LATENT PRINT REPORT

**LABORATORY CASE NO:** 061000289

**DATE ISSUED:** 7/31/06

**Received From:** Davis, Larry
**Received By:** McEachen, Colleen
**Date Received:** 5/23/06
**Time Received:** 1:00 pm

## EXHIBIT(S):

| | |
|---|---|
| 32-a | Latent lifts from crime scene |

## RESULTS:

| | |
|---|---|
| 02-a | Examination failed to reveal the presence of latent prints. |
| 03-a | Examination failed to reveal the presence of latent prints. |
| 04-a | Examination revealed the presence of identifiable latent fingerprint(s). |
| | The latent fingerprint(s) were searched against the AFIS database with no identifications. |
| | See results of exhibit(s) 061000289-28a. |
| 05-a | Examination failed to reveal the presence of latent prints. |
| 06-a | Examination failed to reveal the presence of identifiable latent prints. |
| 07-a | Examination failed to reveal the presence of latent prints. |
| 08-a | Examination failed to reveal the presence of identifiable latent prints. |
| 09-a | Examination failed to reveal the presence of latent prints. |
| 10-a | Examination failed to reveal the presence of identifiable latent prints. |
| 11-a | Examination failed to reveal the presence of latent prints. |
| 12-a | Examination failed to reveal the presence of identifiable latent prints. |
| 13-a | Examination revealed the presence of identifiable latent fingerprint(s). |
| | The latent fingerprint(s) lacked sufficient ridge detail for AFIS entry. |
| | See results of exhibit(s) 061000289-28a. |
| 14-a | Examination failed to reveal the presence of identifiable latent prints. |
| 15 | Examination revealed the presence of identifiable latent fingerprint(s). |



INTERNATIONALLY ACCREDITED SINCE 1994

Case 4:17-cv-00027-CLC-SKL   Document 23-1   Filed 02/19/19   Page 51 of 60   PageID #: 148

## OFFICIAL LATENT PRINT REPORT

**LABORATORY CASE NO:** 061000289

**DATE ISSUED:** 7/31/06

The latent fingerprint(s) were searched against the AFIS database with no identifications.

See results of exhibit(s) 061000289-28a.

28-a     The developed latent print(s) from exhibit(s) 061000289-04a, 061000289-13a, 061000289-15 were compared with the known impressions of Adam Clyde Braseel with no identifications.

32-a     Examination failed to reveal the presence of identifiable latent prints.

### DISPOSITION:

The evidence will remain at the Nashville Crime Laboratory until the completion of all requested examinations.

Respectfully Submitted,

*J. E. Reid*

J. E. Reid, CLPE
Special Agent / Forensic Scientist



EXHIBIT ف



01.08.2006 11:52

photo of Adam Braseel introduced at trial as Exhibit 27



photo of Kermit Bryson obtained from Hamilton county sheriff's office website

## Motor Vehicle Record

### Source Information

| | |
|---|---|
| Coverage Begin Date: | 01/01/2001 |
| Information Current Through: | 12/13/2018 |
| Database Last Updated: | 12/20/2018 |
| Update Frequency: | 2X MONTHLY |
| Current Date: | 02/07/2019 |
| Source: | DEPT. OF SAFETY, TITLE & REGISTRATION DIVISION |

### Vehicle Information

| | |
|---|---|
| VIN: | 1FAFP10P2WW233303 |
| Vehicle Type: | PASSENGER CAR |
| Model Year: | 1998 |
| Make: | FORD |
| Body Style: | SEDAN 4D 5P |
| Model/Series: | ESCORT LX |
| Primary Color: | BEIGE |

### Registration Information

| | |
|---|---|
| License Plate Number: | LCE005 |
| Issuing State: | TN |
| Plate Type: | PRIVATE |
| Previous Plate Number: | 64AG983 |
| Previous Plate State: | AL |
| Registration Renewal Date: | 04/29/2002 |
| Expiration Date: | 04/30/2003 |
| Registrant(s) Since: | 04/29/2002 |
| Name: | TINA BRETZ |
| Interest: | REGISTRANT |
| Mailing Address: | PO BOX 452 |
| | 452 |
| | MONTEAGLE, TN 37356-0452 |
| County: | MARION |

### Title Information:

| | |
|---|---|
| Original Title Date: | 11/16/2006 |
| Title Number: | 75132219 |
| Name: | TINA BRETZ |
| Interest: | OWNER |
| Title Transaction Date: | 11/16/2006 |
| Mailing Address: | PO BOX 452 |
| | 452 |
| | MONTEAGLE, TN 37356-0452 |
| County: | MARION |

### Lien Holder Information

| | |
|---|---|
| Name: | CITIZENS TRI COUNTY BANK |
| Interest: | LIEN HOLDER |
| Mailing Address: | PO BOX 399 |
| | 399 |
| | MONTEAGLE, TN 37356-0399 |

EXHIBIT

7

| | |
|---|---|
| County: | MARION |
| Name: | FIRST COMMUNITY FINANCIAL |
| Interest: | LIEN HOLDER |
| Mailing Address: | 105 COLLEGE ST |
| | MONTEAGLE, TN 37356-7004 |
| County: | GRUNDY |
| Name: | FIRST COMMUNITY FINANCIAL |
| Interest: | LIEN HOLDER |
| Mailing Address: | 105 WEST COLLEGE ST |
| | MONTEAGLE, TN 37356 |
| County: | GRUNDY |

## Historical DMV Record 1

| | |
|---|---|
| Title Transfer Date: | 11/21/2003 |
| Name: | TINA BRETZ |
| Interest: | OWNER |
| Mailing Address: | PO BOX 452 |
| | 452 |
| | MONTEAGLE, TN 37356-0452 |
| County: | GRUNDY |
| Title Transfer Date: | 11/21/2003 |
| Name: | CITIZENS TRI COUNTY BANK |
| Interest: | LIEN HOLDER |
| Mailing Address: | PO BOX 399 |
| | 399 |
| | MONTEAGLE, TN 37356-0399 |
| County: | GRUNDY |
| Title Transfer Date: | 11/21/2003 |
| Name: | FIRST COMMUNITY FINANCIAL |
| Interest: | LIEN HOLDER |
| Mailing Address: | 105 WEST COLLEGE ST |
| | MONTEAGLE, TN 37356 |
| County: | GRUNDY |

*Thomson Reuters Legal is not a consumer reporting agency and none of its services or the data contained therein constitute a 'consumer report' as such term is defined in the Federal Fair Credit Reporting Act (FCRA), 15 U.S.C. sec. 1681 et seq. The data provided to you may not be used as a factor in consumer debt collection decisioning, establishing a consumer's eligibility for credit, insurance, employment, government benefits, or housing, or for any other purpose authorized under the FCRA. By accessing one of our services, you agree not to use the service or data for any purpose authorized under the FCRA or in relation to taking an adverse action relating to a consumer application.*

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.



Photo of 1998 Ford Escort obtained from Google search



Photo of vehicle introduced at trial as Exhibit 6



EXHIBIT

8



**Vehicle Information:**
**1998 FORD ESCORT LX**
VIN: 1FAFP10P2WW233303
SEDAN 4 DR
2.0L I4 F SOHC 8V
GASOLINE
FRONT WHEEL DRIVE
**Standard Equipment | Safety Options**

**CARFAX® Vehicle History Report™**
An independent company established in 1986

US $39.99

**Branded Titles: Rebuilt, Salvage**

**3** Previous owners

Personal vehicle

Last owned in Tennessee

**12** Detailed records available

**61,572**   Last reported odometer reading

This CARFAX Vehicle History Report is based only on information supplied to CARFAX and available as of 2/8/19 at 10:41:20 AM (CST). Other information about this vehicle, including problems, may not have been reported to CARFAX. Use this report as one important tool, along with a vehicle inspection and test drive, to make a better decision about your next used car.



| Ownership History  The number of owners is estimated | Owner 1 | Owner 2 | Owner 3 |
|---|---|---|---|
| Year purchased | 1998 | 2000 | 2002 |
| Type of owner | Personal | Personal | Personal |
| Estimated length of ownership | 1 yr. 9 mo. | 2 yrs. 2 mo. | 16 yrs. 7 mo. |
| Owned in the following states/provinces | Alabama | Alabama, Tennessee | Tennessee |
| Estimated miles driven per year | --- | --- | --- |
| Last reported odometer reading | 176 | 51,426 | 61,572 |



| Title History  CARFAX guarantees the information in this section | Owner 1 | Owner 2 | Owner 3 |
|---|---|---|---|
| **Salvage | Junk | Rebuilt | Fire | Flood | Hail | Lemon**   ALERT! | No Problem | Alert! Problem Found | Alert! Problem Found |
| **Not Actual Mileage | Exceeds Mechanical Limits** | No Problem | No Problem | No Problem |

**Alert!** Severe problems were reported by a state Department of Motor Vehicles (DMV). This vehicle does not qualify for the CARFAX Buyback Guarantee.



| Additional History  Not all accidents / issues are reported to CARFAX | Owner 1 | Owner 2 | Owner 3 |
|---|---|---|---|
| **Total Loss**  No total loss reported to CARFAX. | No Issues Reported | No Issues Reported | No Issues Reported |
| **Structural Damage**  No structural damage reported to CARFAX. | No Issues Reported | No Issues Reported | No Issues Reported |
| **Airbag Deployment**  Airbag deployment reported on 03/10/2000. | Airbag Deployment | No New Issues Reported | No Issues |
| | No Issues | No Issues | No Issues |

EXHIBIT
9

**Odometer Check**
No indication of an odometer rollback.

**Accident / Damage**
DMV title problems reported. Accident reported on 03/10/2000.

**Manufacturer Recall**
A current list of recalls is available at Ford Motor Company.

**Basic Warranty**
Original manufacturer warranty likely voided by manufacturer after vehicle was severely damaged.

 Indicated
 Indicated
Indicated

 Accident Reported
 Severe Damage
 Severe Damage

 No Recalls Reported
 No Recalls Reported
 No Recalls Reported

 Warranty Active
Warranty Voided
Warranty Voided





## CARFAX Detailed History



**Owner 1**

| Date: | Mileage: | Source: | Comments: |
|---|---|---|---|
| 02/10/1998 | | NICB | Vehicle manufactured and shipped to original dealer |
| 06/05/1998 | | Alabama Motor Vehicle Dept. Cordova, AL | Titled or registered as personal vehicle |
| 07/29/1998 | 176 | Alabama Motor Vehicle Dept. Cordova, AL Title #22959655 | Title issued or updated First owner reported |
| 03/10/2000 | | Alabama Damage Report | Accident reported Involving right front impact with another motor vehicle Airbag deployed |

CARFAX Airbag Tips



**Owner 2**

| Date: | Mileage: | Source: | Comments: |
|---|---|---|---|
| 03/24/2000 | 51,414 | Alabama Motor Vehicle Dept. | Vehicle purchase reported |
| 06/08/2000 | | Alabama Motor Vehicle Dept. Montgomery, AL Title #26089158 | New owner reported **SALVAGE TITLE/CERTIFICATE ISSUED** Vehicle color noted as Brown |
| 08/17/2000 | 51,426 | Tennessee Motor Vehicle Dept. Manchester, TN Title #60991608 | Dealer took title of this vehicle while it was in inventory **SALVAGE TITLE/CERTIFICATE ISSUED REBUILT TITLE ISSUED** |

**Owner 3**



| Date: | Mileage: | Source: | Comments: |
|---|---|---|---|
| 06/10/2002 | 61,572 | Tennessee Motor Vehicle Dept. Monteagle, TN Title #64776530 | New owner reported **REBUILT TITLE ISSUED** |

| 05/01/2003 | Tennessee<br>Motor Vehicle Dept.<br>Monteagle, TN<br>Title #66717313 | **REBUILT TITLE ISSUED** |
| 05/27/2003 | Tennessee<br>Motor Vehicle Dept.<br>Monteagle, TN<br>Title #67455434 | **REBUILT TITLE ISSUED**<br>Loan or lien reported |
| 11/21/2003 | Tennessee<br>Motor Vehicle Dept.<br>Monteagle, TN<br>Title #68587405 | **REBUILT TITLE ISSUED**<br>Loan or lien reported |
| 11/18/2006 | Tennessee<br>Motor Vehicle Dept.<br>Monteagle, TN<br>Title #75132219 | **REBUILT TITLE ISSUED**<br>Loan or lien reported |

Have Questions? Please visit our Help Center at www.carfax.com.

 Glossary

### Accident Indicator
CARFAX receives information about accidents in all 50 states, the District of Columbia and Canada.

Not every accident is reported to CARFAX. As details about the accident become available, those additional details are added to the CARFAX Vehicle History Report. CARFAX recommends that you have this vehicle inspected by a qualified mechanic.

- According to the National Safety Council, Injury Facts, 2015 edition, 8% of the 254 million registered vehicles in the U.S. were involved in an accident in 2013. Over 74% of these were considered minor or moderate.
- This CARFAX Vehicle History Report is based only on information supplied to CARFAX and available as of 2/8/19 at 10:41:20 AM (CST). Other information about this vehicle, including problems, may not have been reported to CARFAX. Use this report as one important tool, along with a vehicle inspection and test drive, to make a better decision about your next used car.

### Alabama Damage Reports:
- Provide an estimate of the extent of damage in its accident reports for the following:
  - NO DAMAGE: The vehicle was not damaged.
  - MINOR: The accident damage does not affect the operation of the vehicle and should not compromise vehicle safety.
  - FUNCTIONAL: The vehicle could be driven from the accident location.
  - DISABLED: The vehicle cannot be driven from the accident scene due to damage. The vehicle had to be towed or hauled away from the accident location.
  - SEVERE / MAJOR: The accident damage was major and may affect the operation of the vehicle.

- Are required if the estimated damage exceeds $500

### Airbag Deployment
Occurs when the driver, passenger or side airbag has been used or deployed during a crash or other incident. If an airbag has been deployed, it must be replaced by a qualified technician. Have this car inspected by a mechanic prior to purchase. Use CARFAX Airbag Tips to make sure this vehicle's airbag system is functional.

### First Owner
When the first owner(s) obtains a title from a Department of Motor Vehicles as proof of ownership.

### Ford or Lincoln Mercury Recall
The Ford Motor Company provides Carfax with Field Service Action and recall information regarding safety, compliance and emissions programs announced since 2000 for a specific vehicle. For complete information regarding programs or concerns about this vehicle, please contact a local Ford or Lincoln Mercury Dealer.

### New Owner Reported
When a vehicle is sold to a new owner, the Title must be transferred to the new owner(s) at a Department of Motor Vehicles.

### Ownership History
CARFAX defines an owner as an individual or business that possesses and uses a vehicle. Not all title transactions represent changes in ownership. To provide estimated number of owners, CARFAX proprietary technology analyzes all the events in a vehicle history. Estimated ownership is available for vehicles manufactured after 1991 and titled solely in the US including Puerto Rico. Dealers sometimes opt to take ownership of a vehicle and are required to in the following states: Maine, Massachusetts, New Jersey, Ohio, Oklahoma, Pennsylvania and South Dakota. Please consider this as you review a vehicle's estimated ownership history.

### Rebuilt/Reconstructed Title

A Rebuilt/Reconstructed vehicle is a salvage vehicle that has been repaired and restored to operation. These vehicles are often severely damaged before they are rebuilt and refurbished parts are typically used during reconstruction. In most states, an inspection of the vehicle is required before the vehicle is allowed to return to the road.

**Salvage Title**

A Salvage Title is issued on a vehicle damaged to the extent that the cost of repairing the vehicle exceeds approximately 75% of its pre-damage value. This damage threshold may vary by state. Some states treat Junk titles the same as Salvage but the majority use this title to indicate that a vehicle is not road worthy and cannot be titled again in that state. The following eleven states also use Salvage titles to identify stolen vehicles - AZ, FL, GA, IL, MD, MN, NJ, NM, NY, OK and OR.

**Title Issued**

A state issues a title to provide a vehicle owner with proof of ownership. Each title has a unique number. Each title or registration record on a CARFAX report does not necessarily indicate a change in ownership. In Canada, a registration and bill of sale are used as proof of ownership.

**Follow Us:**    **facebook.com/CARFAX**    **@CarfaxReports**    **CARFAX on Google+**

CARFAX DEPENDS ON ITS SOURCES FOR THE ACCURACY AND RELIABILITY OF ITS INFORMATION. THEREFORE, NO RESPONSIBILITY IS ASSUMED BY CARFAX OR ITS AGENTS FOR ERRORS OR OMISSIONS IN THIS REPORT. CARFAX FURTHER EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. CARFAX®
© 2019 CARFAX, Inc., a unit of IHS Markit. All rights reserved.
Covered by United States Patent Nos. 7,113,853; 7,778,841; 7,596,512, 8,600,823; 8,595,079; 8,606,648; 7,505,838.
2/8/19 10:41:20 AM (CST)